ALYESKA PIPELINE SERVICE COMPANY et al.

v.

The UNITED STATES.

No. 446–79L.

United States Court of Claims.

May 6, 1981.

■■■■■■■■■■■■

---

Ernest C. Baynard III, Washington, D. C., Attorney of Record, for plaintiff. Connole & O'Connell, Washington, D. C., and Alfred T. Smith, Alyeska Pipeline Service Co., Anchorage, Alaska, of counsel.

Raymond W. Mushal, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant. Donald W. Stever, Jr., Dept. of Justice, and James K. Augustine, United States Coast Guard, Arlington, Va., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This is an action by the Alyeska Pipeline Service Company, which with its constituent companies owns and operates the Trans-Alaska Pipeline System, to recover from the United States the costs of cleaning up oil discharged from the pipeline into navigable waters. The suit is brought pursuant to section 311 of the Water Pollution Control Act, 33 U.S.C. § 1321, which provides that the owner or operator of the facilities that caused the pollution may recover its clean-up costs from the United States if the oil discharge was caused by a third party and did not involve any fault of the owner or operator. The question before us, raised by the defendant's motion for summary judgment dismissing the petition, is whether the subsequent Trans-Alaska Pipeline Authorization Act, Pub.L. No. 93–153, title II, 87 Stat. 584, 43 U.S.C. § 1651 et seq. (Pipeline Act), bars the plaintiffs from recovering. We hold that it does, and therefore grant the defendant's motion for summary judgment and dismiss the petition.

### I.

The plaintiffs' petition makes the following allegations, which the government accepts for purposes of its motion for summary judgment: In February 1978, an unknown saboteur detonated an explosive charge which breached the pipeline, causing the discharge of oil "in harmful quantities" into the navigable waters of the United States and onto adjoining shorelines in Alaska. In response, the plaintiffs repaired the pipeline to contain the leak, and removed the oil in accordance with applicable federal regulations, at a total cost of $1,169,035.51. According to the plaintiffs, under the Water Pollution Control Act the foregoing facts entitle them to recover their clean-up costs.

The United States apparently does not deny that these facts state a claim for relief under the Water Pollution Control Act. It contends, however, that the governing statute in this case is not that Act but the Pipeline Act, and that under the latter statute the plaintiffs cannot recover.

### II.

A. The pertinent provisions of the two statutes are as follows. The Water Pollution Control Act directs the President to remove or arrange for the removal of oil discharged into navigable waters. Section 311(c), 33 U.S.C. § 1321(c). It makes the owners and operators of any onshore facility causing such pollution liable to the United States for the government's clean-up costs not exceeding $50 million, unless the spill was caused solely by an act of God, an act of war, negligence by the government, an act or omission of a third party, or a combination of these causes. Section 311(f)(2), 33 U.S.C. § 1321(f)(2). If, however, the owner or operator itself cleans up an oil discharge, it may recover in a suit against the United States in this court the reasonable cost of that cleanup if it establishes that the discharge

was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party,

without regard to whether such act or omission was or was not negligent, or any combination of the foregoing causes.

Section 311(i)(1), 33 U.S.C. § 1321(i)(1).

In sharp contrast, section 204(b) of the Pipeline Act makes the owner or operator liable for the cost of removal of an oil discharge and does not permit it either to recover its removal costs or to avoid reimbursing the United States, if the latter makes the cleanup, on the ground that the discharge was caused solely by a third party. It states:

> If any area within or without the [pipeline] right-of-way or permit area granted under this chapter is polluted by any activities conducted by or on behalf of the holder to whom such right-of-way or permit was granted, and such pollution damages or threatens to damage aquatic life, wildlife, or public or private property, the control and total removal of the pollutant shall be at the expense of such holder .... Upon failure of such holder to adequately control and remove such pollutant, the Secretary, in cooperation with other Federal, State, or local agencies, or in cooperation with such holder, or both, shall have the right to accomplish the control and removal at the expense of such holder.

43 U.S.C. § 1653(b).

On their faces, these two provisions are inconsistent. Section 204(b) of the Pipeline Act provides that the "control and total removal of the pollutant shall be at the expense of" the pipeline owners and operators, without an exception for situations where the discharge was caused solely by a third person. Section 311(i)(1) of the Water Pollution Control Act, however, permits the owner or operator of the discharging facility to avoid liability to the government for clean-up costs if a third person caused the discharge, by doing the cleanup itself and recovering its costs from the United States.

Under normal principles of statutory interpretation, the later enacted Pipeline Act prevails over the earlier enacted Water Pollution Control Act. *See Regional Rail Reorganization Act Cases,* [*Blanchette v. Connecticut General Insurance Corp.*] 419 U.S. 102, 134, 95 S.Ct. 335, 354, 42 L.Ed.2d 320 (1974). This is particularly true where, as here, the later legislation is a special statute addressed to the specific case while the earlier one is a more general law. *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974).

B. The plaintiffs contend, however, that section 204(b) does not apply in this case. They construe the section as incorporating a fault standard of liability and as intending only to abolish the limits on the amount of recovery under the Water Pollution Control Act.

1. The plaintiffs argue that the oil discharge did not result from "any activities conducted by or on behalf of" them, since it was caused by sabotage committed by a third person. The plaintiffs thus construe section 204(b) as making the pipeline liable for oil clean-up costs only if the pipeline or its agents caused the discharge, *i. e.,* only where they were at fault.

We do not read section 204(b) that narrowly. The pipeline area in this case was "polluted by" the "activities" of the plaintiffs in operating the pipeline. The pollution resulted from the breach of the pipeline through which oil was being transported. The cause of the breach is immaterial in determining whether the discharge was attributable to the plaintiffs' "activities."

Congress' use of the broad phrase "any activities conducted by or on behalf of" the pipeline was not inadvertent. These words are in sharp contrast to the language of the Water Pollution Control Act, in which the liability of the owner or operator to clean up an oil discharge depends upon who or what caused the discharge. As noted previously, under the Water Pollution Control Act, an owner or operator may recover from the United States its clean-up costs for an oil discharge that was caused solely by "an act or omission of a third party ...." 33 U.S.C. § 1321(i)(1). The liability for clean-up costs that section 204(b) creates, however, is based not upon an "act or omission" of the owners or operators of the pipeline, but upon pollution resulting from

834

"any activities conducted by or on behalf of" them.

This broad standard, as the conference committee report on the Pipeline Act explained, imposes liability upon the pipeline owners and operators for removal of oil from "any area that is polluted by *operations* of the [pipeline permit] holder." H.R. Conf. Rep. No. 93–624, 93d Cong., 1st Sess. 24 (1973), *reprinted in* [1973] U.S.Code Cong. & Ad.News 2417, 2523, 2526 (emphasis added). In section 204(b) Congress thus made the plaintiffs absolutely liable for any pollution resulting from the operation of the pipeline, without regard to whose fault caused the pollution.

Other provisions of the Pipeline Act that also use the word "activities" further support this conclusion. Section 204(a), which imposes liability on the pipeline owners for environmental damages, provides that they "shall be strictly liable to all damaged parties ... without regard to fault" except

when the holder of the pipeline right-of-way ... can prove that damages in connection with or resulting from activities along or in the vicinity of the proposed ... pipeline right-of-way were caused by an act of war or negligence of the United States, other government entity, or the damaged party ....

43 U.S.C. § 1653(a)(1). This provision distinguishes between environmental damage "resulting from activities" of the pipeline's operations and that "caused by an act" of an intervening party. *See also* the provision of title I of Pub.L. No. 93–153, 87 Stat. 576, enacted with the Pipeline Act, that permits the Secretary of the Interior to establish "a standard of strict liability to govern activities taking place on a right-of-way or permit area which the Secretary or agency head determines, in his discretion, to present a foreseeable hazard or risk of danger to the United States." 30 U.S.C. § 185(x)(2). The only exceptions to this strict liability standard occur when "damage or injury" results from "an act of war" or "negligence of the United States." 30 U.S.C. § 185(x)(3).

2. The plaintiffs argue that the legislative history of the Pipeline Act shows that section 204(b) was intended only to remove the limit the Water Pollution Control Act set upon the amount of clean-up costs the United States could recover from the owner or operator of a polluting facility. The legislative history does not justify this conclusion. Instead, it supports our conclusion that section 204(b) makes the plaintiffs absolutely liable for their costs of removing the oil discharged from their pipeline.

Section 204(b) originated as a floor amendment that Representative Dingell proposed to add to section 207 of the bill. 119 Cong. Rec. 27716–17 (1973). Section 207 then contained provisions similar to those now in sections 204(a) and (c), which respectively impose strict liability upon the pipeline owners and operators for damages to land or other resources and upon vessel owners for discharge of oil from vessels transporting it from the pipeline. The House Committee Report on the bill explained that section 207

imposes strict liability, regardless of fault, on the holder of a trans-Alaskan right-of-way or permit for damages to the United States, the State of Alaska, or any other party caused by the holder's activities along the route of the pipeline. The only exceptions are damages caused by an act of war or by the negligence of the United States or any other government [entity]

and "imposes similar no-fault liability for damages resulting from discharges of oil" from vessels. H.R.Rep. No. 93–414, 93d Cong., 1st Sess. 18–19 (1973).

In offering the amendment, which the House adopted after only brief debate, Mr. Dingell stated:

The committee has sought to impose absolute liability for oil spills and environmental damage resulting from the pipeline. However, even though sections 207(a), (b), and (c) impose on the holder of the right-of-way this strict liability for damages resulting from the holder's activities at any point along the pipeline and from the discharge of oil from vessels

carrying oil which had been transported through the pipeline, these sections do not fully cover the matter of reimbursing the United States for costs incurred by the United States in removing pollutants.

Thus the Water Pollution Control Act, which never envisaged spills from the trans-Alaska pipeline but is nevertheless applicable to the matter of reimbursement for cleanup costs in removing oil spills in Alaska, imposes an $8 million limitation [now $50 million, 33 U.S.C. § 1321(f)(2) (Supp. II, 1978)] on the liability of an onshore oil facility for the cost of cleaning up its oil spill. This limit could be wholly inadequate to pay for the cost to the United States of removing oil spilled from the pipeline.

The amendment I offer, therefore, would remove the dollar limitation for damages resulting from and for reimbursement of the cost of removal of any spill of oil transported through the trans-Alaska pipeline.

\* \* \* \* \* \*

To recapitulate very briefly, the function is to see to it that we can assess the cost to the Federal Government of cleanup against the individual who has the permit.

119 Cong. Rec. 27717 (1973).

In response to a statement by another member, Mr. Dingell "reiterate[d] that absent the language of this amendment the United States may not be fully compensated for the cost of cleanup." *Id.*

Although the narrow purpose of the amendment was to remove the $8 million limit upon the clean-up costs the United States could recover from a polluter under the Water Pollution Control Act, the language, intent, and effect of the provision were not so limited. To the contrary, Representative Dingell stated that the committee's objective of imposing absolute or strict liability for oil discharges "resulting from the pipeline" would be thwarted unless the United States could recover its total cleanup costs "against the individual who has the permit." The amendment did not eliminate the $8 million limitation by amending the

Water Pollution Control Act. Instead, it added to the Pipeline Act a new provision making the pipeline owners and operators responsible for the total clean-up costs without regard to whether they or the United States did the work.

The basic objective of Mr. Dingell's amendment thus was to make the pipeline owners and operators absolutely liable for the total costs of cleaning up an oil discharge resulting from the operation of the pipeline. It would defeat that objective to permit the plaintiffs to recover from the United States under the Water Pollution Control Act their costs of cleaning up an oil discharge from their pipeline that was caused by the activity of a third person and not the fault of the plaintiffs.

For these reasons it is also immaterial that section 204(b), unlike other provisions of the Pipeline Act, does not contain words like "strictly liable" or "liable without fault" in defining the liability of those whose facilities cause pollution. As we have shown, the language and legislative history of section 204(b) demonstrate that Congress intended to make the pipeline owners and operators absolutely liable for the cost of cleaning up oil discharged from the pipeline. The absence of specific language in that section explicitly so stating does not negate that conclusion.

C. These reasons also refute the plaintiffs' further contention that the provision in section 204(b) that the cleanup of the oil discharge "shall be at the expense of" the pipeline owners and operators means only that they are to pay the initial cost of that work, but does not bar them from subsequently recovering that cost from the United States under the Water Pollution Control Act. There is nothing in either the language or the legislative history of section 204(b) indicating that Congress intended the words "at the expense of" to have that narrow or unusual meaning.

Indeed, the plaintiffs' argument is inconsistent with the last sentence of section 204(b), which provides that if the permit holder fails to clean up the discharge, the

United States may do so "at the expense of" such holder. Since section 204(b) uses the same phrase to cover both situations, it would be anomalous to permit the United States to recover its clean-up costs from the pipeline owner and operator, yet to permit the latter, if it performed the cleanup, to recover its costs from the United States. When Congress said that the removal of the discharged oil was to be "at the expense of" the pipeline owner and operator, it meant precisely that; no matter who did the work, the cost ultimately was to be borne by the pipeline owner and operator.

D. The plaintiffs point out that the Water Pollution Control Act specifically makes the reimbursement provision inapplicable to situations where liability for clean-up costs is established pursuant to two specified statutes other than the Pipeline Act. That provision states:

The provisions of [section 311(i), 33 U.S.C. § 1321(i)] shall not apply in any case where liability is established pursuant to the Outer Continental Shelf Lands Act, or the Deepwater Ports Act of 1974.

Section 311(i)(2), 33 U.S.C. § 1321(i)(2).

The plaintiffs argue that if Congress had intended to make the Water Pollution Control Act reimbursement provisions inapplicable to liability imposed by the Pipeline Act, it would have so stated in section 311(i)(2). They note that the exception for the Deepwater Ports Act was added by the Clean Water Act of 1977, Pub.L. No. 95–217, § 58(m), 91 Stat. 1596, after enactment of the Pipeline Act. They conclude that if Congress had intended to make these provisions inapplicable to clean-up costs imposed by the Pipeline Act, it would be that time also have added the latter Act to the excepted statutes.

The conclusion the plaintiffs draw from their premises does not necessarily follow. It is equally plausible that Congress did not add the Pipeline Act to the exceptions in section 311(i)(2) because it believed that in section 204(b) it had already provided that exception. The legislative history of the Clean Water Act of 1977 shows that Congress added the exception for the Deepwa-

ter Ports Act to section 311(i)(2) because of belief that the Ports Act had not altered or changed the Water Pollution Control Act. See S.Rep. No. 95–370, 95th Cong., 1st Sess. 64–65 (1977), reprinted in [1977] U.S.Code, Cong. & Ad.News 4326, 4389–90; H.R.Conf. Rep. No. 95–830, 95th Cong., 1st Sess. 91 (1977), reprinted in [1977] U.S.Code Cong. & Ad.News 4424, 4466. In any event, whatever significance these arguments may have in interpreting these statutes, they are strongly outweighed by the considerations pointing to the contrary conclusion we have previously set forth.

E. At oral argument the plaintiffs contended that even if section 204(b) of the Pipeline Act governs this case, summary judgment for the defendant should not be granted because the defendant has not shown, as that section requires, that the discharge of oil "damage[d] or threaten[ed] to damage aquatic life, wildlife, or public or private property," and that a trial is necessary to determine that issue. In their petition, however, the plaintiffs stated that "oil in harmful quantities" was discharged into navigable waters and onto adjoining shorelines. In their briefs the plaintiffs stated that approximately 12,000 to 14,000 barrels of oil were discharged. The discharge of that large a quantity of oil into navigable waters necessarily at least "threaten[ed]" to, if it did not actually, damage aquatic life, wildlife, or public or private property.

## CONCLUSION

The defendant's motion for summary judgment is granted, and the petition is dismissed.