973 F.2d 1468
 1993 A.M.C. 9, 61 USLW 2154, 22
Envtl. L. Rep. 21,500
 Donald SLAVEN; Salvatore Russo; Carl Gassaway; Yeriko
Nitta, d/b/a The Seacliff Motel; Salvatore Manzella;
Steven Panto and Donna Panto; Heinz Pet Products Company, a
Division of Star-Kist Foods, Inc., a California Corporation,
Plaintiffs-Appellees,
v.
BP AMERICA, INC.; BP Oil Shipping Co., U.S.A.; BP Oil
Supply Company; American Trading Transportation
Company, Inc.; American Trading and
Production Corporation,
Defendants-Appellees,
and
Trans-Alaska Pipeline Liability Fund, Defendant-Appellant.
 No. 92-55155.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 5, 1992.
Decided Aug. 31, 1992.
 
 Randolph D. Moss, Wilmer, Cutler & Pickering, Washington, D.C., for defendant-appellant.
 David E.R. Woolley, Williams Woolley Cogswell Nakazawa & Russell, Long Beach, Cal., for plaintiffs-appellees.
 Linus Masouredis, Deputy Atty. Gen., Oakland, Cal., for defendant-appellee.
 William P. Barry, Baker Hostetler McCutchen Black, Los Angeles, Cal., for defendant-appellee.
 Philip A. Berns (argued), Atty., and Warren A. Schneider, Asst. Atty., U.S. Dept. of Justice, Civil Div., Torts Branch, West Coast Office, for Appellee, U.S.
 Appeal from the United States District Court for the Central District of California.
 Before TANG, SCHROEDER, and BEEZER, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 In February 1990, the oil tanker American Trader spilled approximately 400,000 gallons of Alaskan crude oil into the Pacific Ocean, off Huntington Beach, California. The oil had been transferred to the American Trader from the Keystone Canyon, which had loaded the oil in Alaska. Various parties filed suit against the owners of the ship and oil and against the Trans-Alaska Pipeline Liability Fund ("the Fund"). The Fund moved to dismiss the claims against it, arguing that its governing statute made it liable only for spills by ships that had loaded their oil in Alaska, and not for ships that had received Alaskan oil from another carrier. The district court denied the Fund's motion. The Fund appeals. We affirm.
 
 BACKGROUND
 
 2
 The facts surrounding the February 1990 oil spill are, at least at this stage of the litigation, undisputed. In January 1990, the supertanker Keystone Canyon loaded a cargo of Alaskan oil at the Trans-Alaska pipeline terminal facility in Valdez, Alaska. The oil had travelled from Alaska's North Slope to Valdez through the Trans-Alaska pipeline. When the Keystone Canyon arrived offshore of Long Beach, California, it trans-loaded or "lightered" nearly 24 million gallons of its crude to the tanker American Trader. Lightering was necessary because the Keystone Canyon is too large to dock at the Los Angeles and San Francisco area port facilities.
 
 
 3
 After receiving the oil, the American Trader set course for the Golden West Refining Offshore Mooring Terminal at Huntington Beach, California. On February 7, 1990, while approaching the mooring at low tide, the American Trader ran over its own anchor, puncturing its hull and spilling approximately 400,000 gallons of crude oil into the ocean. The spill caused widespread damage to the beaches and waters off California.
 
 
 4
 The Fund promptly publicized the procedures for those injured by the spill to seek compensation under the Trans-Alaska Pipeline Authorization Act, - ("TAPAA"). The Fund also entered into agreements with the owners of the oil (British Petroleum) and of the American Trader (American Trading Transportation Company) to ensure the prompt payment of claims.
 
 
 5
 Individuals injured by the spill (collectively, "Slaven") filed suit in federal district court against the Fund, British Petroleum, American Trading Transportation Company, and others. The sole cause of action against the Fund arises under TAPAA's strict liability provision, (c).
 
 
 6
 The Fund moved to dismiss the claims against it on the ground that TAPAA does not apply to oil spills from vessels that were not loaded at an Alaskan pipeline terminal facility. Treating the motion as one for summary judgment, the district court refused to dismiss. The district court concluded that the plain language of the statute was inconsistent and inconclusive on the question of the extent of the Fund's liability. Turning to legislative history, the district court held that the Fund's reliance on the post-enactment observations of a single legislator could not override the consistent interpretation given the statute by the three agencies charged with its administration. Because the three agencies--the Department of the Interior, the Federal Maritime Commission, and the Coast Guard--had all promulgated regulations instructing that strict liability extended to trans-loaded oil, the district court ruled that TAPAA did cover the American Trader spill and denied the motion to dismiss.
 
 
 7
 After the district court certified its decision for interlocutory appeal, (b), the Fund timely sought permission from this court to take the appeal. Permission was granted on February 13, 1992, and this appeal ensued.
 
 STANDARD OF REVIEW
 
 8
 We review de novo the district court's ruling on summary judgment. (9th Cir.1989), cert. denied, (1990). The applicability of TAPAA to the American Trader's trans-loaded oil is a question of statutory construction, which we also review de novo. See (9th Cir.1991).
 
 DISCUSSION
 I. TAPAA's Strict Liability Provision
 A. Statutory Framework
 
 9
 TAPAA was enacted in 1973 against a backdrop of congressional concern about the nation's dependence on foreign oil. See (a) ("The early development and delivery of oil and gas from Alaska's North Slope to domestic markets is in the national interest because of growing domestic shortages and increasing dependence upon insecure foreign sources."). Previously, Congress had studied two options for delivering Alaska North Slope Oil to the lower 48 states. The trans-Canada pipeline plan envisioned a wholly land-based delivery system, routing the oil through a pipeline across Canada and Alaska to the Midwestern states. The alternative, the trans-Alaska pipeline, involved piping the oil from the North Slope to Alaskan ports, followed by shipping the oil on tankers to the West Coast of the United States. See generally S.Rep. No. 207, 93rd Cong., 1st Sess., reprinted in , 2424-31; Rights-of-Way Across Federal Lands: Transportation of Alaska's North Slope Oil: Hearings Before the Committee on Interior and Insular Affairs, 93rd Cong., 1st Sess., pt. IV (1973); Oil and Natural Gas Pipeline Rights-of-Way: Hearings before the Subcommittee on Public Lands of the Committee on Interior and Insular Affairs, 93rd Cong., 1st Sess., pt. I (1973). Through TAPAA, Congress elected the latter scheme for transportation of Alaskan crude oil.
 
 
 10
 We recently observed that, in conjunction with authorizing the construction and operation of the trans-Alaska pipeline, TAPAA established "a comprehensive liability scheme applicable to damages resulting from the transportation of trans-Alaska pipeline oil." Kee Leasing Co. v. McGahan (In re The Glacier Bay), 944 F.2d 577, 580-81 (9th Cir.1991). Section 1653 of 43 U.S.C. provides the blueprint for TAPAA's strict liability scheme. Section 1653(a) makes the holders of pipeline right-of-way permits strictly liable for "damages in connection with or resulting from activities along or in the vicinity of" the pipeline right-of-way.
 
 
 11
 While section 1653(a) speaks to liability for the land-based portion of the pipeline system, section 1653(c) governs liability during the marine leg of the transportation route. Section 1653(c) places a $100,000,000 cap on its strict liability provision. (c)(3). The owner and operator of a vessel that discharges oil is responsible for the first $14,000,000 in damages. Id. The Fund then pays any additional claims up to $86,000,000. Id. The Fund is financed by a five-cents-per-barrel tax paid by the owner of the oil at the time it is loaded on a vessel at the pipeline terminal. Id. Sec. 1653(c)(5). The statute expressly reserves the subrogation rights of the Fund, owners, and operators, permitting them to seek compensation for the negligence of others once the victims of an oil spill have been compensated. Id. Sec. 1653(c)(8).
 
 
 12
 At issue in this case are two subsections of section 1653(c). Subsection (c)(1) provides:
 
 
 13
 Notwithstanding the provisions of any other law, if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.
 
 Subsection (c)(7) reads:
 
 14
 The provisions of this subsection shall apply only to vessels engaged in transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States. Strict liability under this subsection shall cease when the oil has first been brought ashore at a port under the jurisdiction of the United States.
 
 
 15
 The Fund contends that, under the plain language of section 1653(c)(1), strict liability only attaches to oil discharged from a vessel "loaded ... at the terminal facilities of the pipeline." Congress so limited strict liability, the Fund continues, because it was concerned primarily with the disastrous environmental consequences that would attend oil spills by supertankers loading in Alaska. Spills by smaller ships onto which the oil was later trans-loaded could be adequately regulated by existing pollution and maritime law, the Fund reasons.
 
 
 16
 Slaven counters that the Fund's theory circumvents the plain language of section 1653(c)(7), which provides that strict liability ends only when the oil is first brought ashore. The Fund's position, Slaven insists, misunderstands the animating force behind TAPAA. According to Slaven, Congress sought through TAPAA to internalize the environmental costs of transporting Alaskan oil. The imposition of strict liability ensures that oil and shipping companies, rather than individuals living along the pipeline route, will bear the burden of repairing damage caused by the oil.
 
 
 17
 In short, the issue confronting this court is whether TAPAA's strict liability provision follows the oil itself or the vessel onto which the oil is loaded.
 
 B. Plain Language
 
 18
 The starting point of our inquiry is TAPAA's plain language. (1989); (9th Cir.1990), cert. denied, (1991). The Fund insists that the plain language of section 1653(c)(1) limits strict liability to vessels "loaded ... at the terminal facilities of the pipeline." Because the American Trader loaded its oil offshore of California, rather than at a trans-Alaska pipeline terminal facility, the Fund argues, the American Trader spill does not fall within the plain language of section 1653(c)(1).
 
 
 19
 While the Fund's position reflects one possible reading of (c)(1), the subsection's plain language equally sustains Slaven's interpretation of (c)(1). The Fund's reading presumes that the concluding phrase "from such vessel" refers to vessels loaded at a pipeline terminal facility. Because prepositional phrases generally modify the immediately preceding term, however, "from such vessel" could just as plausibly refer to a vessel that discharges Alaskan crude.
 
 
 20
 Indeed, the latter reading is more consistent with the overall structure of the subsection. The opening clause--"if oil that has been transported through the trans-Alaska pipeline"--focuses the paragraph on the oil, rather than the vessel. This grammatically reinforces Slaven's contention that strict liability under TAPAA follows the oil, rather than the vessel.
 
 
 21
 Furthermore, what limited support the language of (c)(1) gives the Fund, the plain language of (c)(7) takes away. Subsection (c)(7) flatly states that strict liability does not cease until the oil is "first ... brought ashore at a port under the jurisdiction of the United States." The oil spilled from the American Trader had not yet been taken ashore. The Fund's interpretation of (c)(1) would thus rewrite the statute to include a new liability termination point in addition to the one already enacted by Congress.
 
 
 22
 The difficulty with the Fund's position is that it asks this court to apply one reading of a particular subsection in isolation from the rest of the statute. As a tenet of statutory construction, however, the plain language rule does not examine statutory words in a vacuum. Rather, courts must consider a statutory provision's phraseology in light of the overall structure and purpose of the legislation. (1990) ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (quotations omitted); see also (1974) (answer to statutory construction issue "depends on the statutory language, read in light of its purposes and legislative history"); ("TAPAA is intended to operate as a whole, not as independent parts."); (9th Cir.1981) (courts should interpret TAPAA "not with mechanical literalism, but with the purpose of implementing Congressional intent").
 
 
 23
 A survey of TAPAA's structure casts doubt on the Fund's proffered interpretation of the statute. First, sections 1653(a) and (b) impose blanket strict liability for damages caused by oil during its transport across land. A construction of section 1653(c) that left a gaping hole in the liability attaching to the marine leg of the oil's journey would thus mark a sharp and unexplained departure from the comprehensive liability that Congress otherwise imposed through TAPAA.
 
 
 24
 Second, nothing in the language of TAPAA suggests that the statute concerns itself only with catastrophic oil spills from the large tankers that dock in Alaska. Nor does any aspect of the statutory scheme hinge upon vessel size. If a fear of supertanker oil spills were really what motivated Congress, one would expect that liability would be defined to some extent by reference to the size of the vessel. Similarly, one might expect that the Fund would be financed by a charge paid by the shipowner and tied to the size of the ship, rather than a fee per barrel of oil paid by the owner of the oil.
 
 
 25
 The structure of TAPAA, in other words, favors an interpretation of the statute's language where strict liability follows the oil rather than the vessel. Other provisions of the statute link liability to virtually every aspect of the oil's movement across land. Subsection (c)(7), when read in this light, indicates a similar congressional intent to cloak the entire marine leg of the transportation system with absolute liability.
 
 
 26
 While far from clear or without ambiguity, the plain language of section 1653, when considered in the context of the entire statute, weighs in favor of imposing strict liability in this case.
 
 C. Legislative History
 
 27
 While a review of TAPAA's plain language, in light of the overall standard and purpose of the law favors imposition of strict liability, we consider it helpful also to consider TAPAA's legislative history as a means of illumining section 1653(c)'s wording. "Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom ..., since the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' " (1989) (quoting (1928)).
 
 
 28
 Although the legislative history does not specifically address the question of liability for trans-loaded oil, committee reports and statements of members of Congress indicate that Congress intended the statute to reach the American Trader spill.
 
 
 29
 The current language of section 1653(c) first appeared in a draft of the legislation proposed by the House/Senate Conference Committee. The committee report accompanying the legislation indicates that the source of the oil (the Trans-Alaska pipeline), rather than the loading locale of the vessel, is what triggers section 1653(c) strict liability:
 
 
 30
 Section 204(c) provides, for vessels that transport North Slope oil in the coastal trade, liability standards that are much stricter than those that apply to vessels that transport other oil in the coastal or foreign trade.
 
 
 31
 ....
 
 
 32
 ... Consequently, the Conferees established a rule of strict liability for damages from discharges of the oil transported through the trans-Alaska pipeline up to $100,000,000.
 
 
 33
 H.R.Conf.Rep. No. 624, 93rd Cong., 1st Sess., reprinted in , 2523, 2530 (emphasis added).
 
 
 34
 Similarly, the chair of the House Committee on Merchant Marine and Fisheries described section 1653(c) as "establish[ing] a structure of strict liability upon any vessel from which there occurs a spill of petroleum while engaged in the carriage of products from the Alaskan pipeline to the lower 48 States." 119 Cong.Rec. H36602 (Nov. 12, 1973) (Rep. Sullivan). Additionally, one member of the Conference Committee noted that, "[f]or the marine leg, from Valdez to ports in the lower 48 States, the conferees agreed that there should be strict liability for any spills." 119 Cong.Rec. H36606 (Nov. 12, 1973) (Rep. Udall) (emphasis added); see also 119 Cong.Rec. S36809 (Nov. 13, 1973).
 
 
 35
 These statements reveal that the Committee that drafted section 1653(c), as well as other members of Congress influential in the legislative process, believed that section 1653(c) would encompass any spills occurring during the marine transportation leg. Not one of these legislators, or any other member of Congress, expressly conditioned liability on the ship having loaded at Valdez.
 
 
 36
 Other comments in the legislative history confirm that the purpose of section 1653(c) is to make the producers of Alaskan crude fully bear the risks and environmental costs of transporting oil.
 
 
 37
 This is a landmark provision for environmental protection and one that may well mark the standard for future oil spills everywhere.... The oil companies have ... consistently promised that both the pipeline and sea leg were safe. We are doing no more than holding them to this promise.
 
 
 38
 119 Cong.Rec. H36606 (Nov. 12, 1973) (Rep. Udall).
 
 
 39
 The Conference Committee Report likewise explained that the liability provisions are meant to "provide an incentive to the owner or operator to operate the vessel with due care" and to ensure that "owners would then share the risk associated with transporting the oil on water." H.R.Conf.Rep. No. 624, reprinted in 1973 U.S.C.C.A.N. at 2531; see also (TAPAA's strict liability provision "ensures that trans-Alaska oil spill victims receive prompt compensation," leaving the parties who profit from the system to fight later amongst themselves about liability).
 
 
 40
 Furthermore, the legislative history belies the Fund's contention that Congress planned to rely on pre-existing anti-pollution laws to cover spills from trans-loaded vessels. Numerous statements indicate that Congress consciously and purposefully subjected Alaskan oil to tougher liability standards than other oil. "It is admittedly forcing a tougher liability standard on Alaskan oil than exists for other oil," noted one member of Congress, "but the House has consistently maintained that the environmental risks of transporting this oil were significantly greater." 119 Cong.Rec. H36606 (Nov. 12, 1973) (Rep. Udall). The Conference Committee Report emphasized the point as well: "Section 204(c) provides, for vessels that transport North Slope oil in the coastal trade, liability standards that are much stricter than those that apply to vessels that transport other oil in the coastal or foreign trade." H.R.Conf.Rep. No. 624, reprinted in 1973 U.S.C.C.A.N. at 2530. Neither of these comments even hints at an easing of this heightened standard based upon where a vessel loads its Alaskan oil.
 
 
 41
 The Fund responds by citing the Senate's rejection of an amendment proposed by Senator Hathaway, the language of which would have indisputably encompassed the American Trader spill. The Fund relies upon cases stating that Congress's earlier express rejection of certain statutory language counsels strongly against interpreting the statute in a manner consistent with the rejected language. See, e.g., (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language.") (quotation omitted);
 
 
 42
 The Fund's argument suffers from two flaws. First, the Senate never rejected Senator Hathaway's amendment. The Senator voluntarily withdrew the amendment the same day he proposed it. 119 Cong.Rec. S24297 (July 17, 1973). Absent a vote on the proposed language, no basis exists for inferring a congressional rebuff of Hathaway's liability proposal.
 
 
 43
 Second, the colloquy preceding Hathaway's withdrawal of the amendment reveals that the decision had nothing to do with expanding strict liability for vessels carrying trans-Alaska pipeline oil. Hathaway's proposed amendment covered all oil transportation in the United States, not just Alaskan oil. Senator Jackson proposed that hearings be conducted on the matter before enacting such legislation. Senator Jackson pointed out the potentially dire consequences of Hathaway's sweeping liability provision for small oil companies and shippers. Id. at S24295. It was in light of these considerations that Senator Hathaway withdrew his amendment. Id. The Fund's suggestion that the short life of this amendment somehow indicates that Congress did not intend to extend strict liability to trans-loaded oil quite simply misunderstands and misinterprets what happened on the Senate floor.
 
 
 44
 The Fund also attempts to undergird its position by pointing to various references in the legislative history to the threat that supertanker oil spills pose to the environment. See, e.g., H.R.Conf.Rep. No. 624, reprinted in 1973 U.S.C.C.A.N. at 2530; 119 Cong.Rec. H6407 (March 6, 1973) (Rep. Aspin); Oil and Natural Gas Pipeline Rights-of-Way at 374-75. While the Fund accurately notes that concerns about supertankers were expressed, supertanker spills were neither a predominant nor frequent topic of debate. Many more comments were made sounding the alarm about any spills of Alaskan oil, regardless of size. See, e.g., S.Rep. No. 207, 93rd Cong., 1st Sess., reprinted in , 2425; H.R.Rep. No. 414, 93rd Cong., 1st Sess. 17 (1973). The Fund fails to point to anything in the legislative history that translates these occasional observations about supertankers into the primary congressional intent animating TAPAA.
 
 
 45
 As a last resort, the Fund introduces comments made by a single legislator during the enactment of the Oil Pollution Act of 1990, Pub.L. No. 101-380, 104 Stat. 484. The House Report on the 1990 Act noted that Representative Tauzin introduced an amendment to "close[ ] a loophole in the Trans-Alaska Pipeline Act to ensure that spills of Alaskan crude, whether from the vessel which originally loaded the crude in Valdez, or a subsequent vessel that carries the oil to a U.S. port, are covered by the provisions of the Act." H.R.Rep. No. 242 (part 2), 101st Cong., 1st Sess. 47 (1989). The Fund relies upon this as evidence that TAPAA does not reach the American Trader spill.
 
 
 46
 We reject this argument for two reasons. First, post-enactment legislative history is generally considered to be of minimal assistance in interpreting a statute.
 
 
 47
 It is well settled that the views of a later Congress regarding the legislative intent of a previous Congress do not deserve much weight. Courts avoid deducing the intent behind one act of Congress from the implication of a second act passed years later.
 
 
 48
 (9th Cir.1985) (citations omitted); see also (1990) (Scalia, J., concurring) ("[T]he views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed."); (1980); (1979) (after-the-fact "legislative observations ... are in no sense part of the legislative history" because "[i]t is the intent of the Congress that enacted [the section] ... that controls") (quotations and citations omitted). This principle applies with special force in this case, where the legislative statement cited post-dates by nearly twenty years the enactment of the statute in question and the legislator who made the relevant observation was not even a member of Congress when TAPAA became law.
 
 
 49
 Second, to the extent random, post-enactment observations are relevant to the interpretation of TAPAA, the 1990 Act's legislative history is inconsistent on the question of section 1653(c)'s applicability to trans-loaded oil. While Representative Tauzin apparently believed such spills would not be covered, at least one other member of Congress specifically stated that TAPAA does apply to the American Trader spill. 136 Cong.Rec. H6923 (Aug. 3, 1990) (Rep. Miller) ("Incidents which qualify for payment under [TAPAA] include the 1987; Exxon Valdez, 1989, and American Trader, 1990."). The 1990 Act's legislative history is thus, at best, ambiguous and inconsistent on the scope of section 1653(c) liability.
 
 
 50
 Cases interpreting TAPAA and its legislative history echo the theme that TAPAA strict liability follows the oil rather than the vessel, so that the American Trader spill falls within TAPAA's compass. In we commented that "Congress, in enacting TAPAA, was clearly concerned about the ability of existing laws to compensate innocent victims of a disastrous trans-Alaska oil spill." (footnote omitted). moreover, repeatedly refers to TAPAA as a "comprehensive" liability scheme for oil spills. A liability scheme that turns upon the fortuity of where a ship loaded its Alaskan crude, by contrast, could hardly be characterized as "comprehensive." See also (9th Cir.1992) (discussing Congressional concern about repairing damages from Alaskan crude oil spills).
 
 
 51
 In we held that, through TAPAA, "Congress intended to facilitate the development and delivery of oil and gas and, at the same time, to protect the environment." "[T]he strict liability provision of section 1653," we continued, "was to deal with the environmental risks of the pipeline." Again, nothing in our opinion indicates that Congress's desire to provide a remedy for oil spills was limited in the manner advocated by the Fund. Spills of Alaskan oil in general, and not just certain spills from certain ships, represent the focal point of TAPAA's legislative history. See also (language and legislative history of section 1653 is designed "to make the pipeline owners and operators absolutely liable for the cost of cleaning up oil discharged from the pipeline"), cert. denied, (1981).
 
 
 52
 We note that the Fund's proposed interpretation of section 1653(c) would permit the easy circumvention of congressional intent. If trans-loading is not covered, ships could load with oil at Valdez, pull away from the dock, and immediately trans-load to other ships, divesting themselves of strict liability before the hazardous voyage even begins. In light of Congress's dedicated effort to enact a "comprehensive remedial" scheme for oil spills, we hesitate to afford section 1653(c) an interpretation that would permit a game of "musical ships" to frustrate congressional intent.
 
 
 53
 In sum, the statute's structure, legislative history, and case interpretations, are consistent with the district court's understanding of TAPAA's scope.
 
 D. Agency Regulations
 
 54
 Finally, we consider the construction that agencies charged with implementing TAPAA have imposed on section 1653(c). See (1984); (9th Cir.1989). We accord such regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." (footnote omitted).
 
 
 55
 Three agencies bear responsibility for implementing TAPAA--the Department of the Interior, the Federal Maritime Commission, and the Coast Guard. Each agency has promulgated regulations applying TAPAA to trans-loaded or lightered Alaskan oil.
 
 
 56
 The Department of the Interior has instructed that section 1653(c) strict liability attaches "where a vessel is engaged in any segment of transportation between the terminal facilities of the Pipeline and ports under the jurisdiction of the United States." (a) (emphasis added); see also (d) (prohibiting loading of trans-Alaska pipeline oil on any vessel not possessing a certificate of financial responsibility demonstrating the owner's ability to satisfy TAPAA's strict liability payment schedule). In promulgating this regulation, the Department addressed a perceived textual conflict between sections 1653(c)(1) and 1653(c)(7). Noting that, as the administering agency, "it has a duty to clarify this apparent inconsistency," the Department opted in favor of extending liability to trans-loaded oil:
 
 
 57
 For two reasons, the Department interprets Section 204(c) to impose strict liability on vessels engaged in any segment of transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States, which vessels are carrying oil that has been transported through the trans-Alaska pipeline system. First, Section 204(c)(7) speaks directly to the question of when strict liability terminates, and it states that "[s]trict liability * * * shall cease when the oil has first been brought ashore" at a United States port. Second, the clear intention of Congress in passing Section 204(c) and in creating the Fund was to provide compensation to parties damaged by spills of Alaskan oil regardless of whether the oil is trans-loaded before it reaches a United States port.
 
 
 58
 42 Fed.Reg. 31,789 (June 23, 1977).
 
 
 59
 The Federal Maritime Commission had the original responsibility for supervising and enforcing compliance with TAPAA's financial responsibility requirements. The Commission enacted regulations mandating that vessels carrying trans-Alaska pipeline oil carry proof of their ability to pay $14,000,000 in strict liability damages should a spill occur. In passing the regulations, the Commission, like the Department of the Interior, observed that the statutory language was confusing. Nevertheless, in the end the Commission agreed with the Department of the Interior that liability extended to trans-loaded vessels:
 
 
 60
 When the broad purposes of the Act are considered, to wit: to push ahead with the construction and operation of the trans-Alaska pipeline without permitting further environmental challenge, and to provide compensation for injuries sustained as a result of the production and transportation of Alaskan oil; and in view of the position taken by the Department of the Interior in its final rules regarding this subject, the Commission concludes that the sounder interpretation of the Act is that its financial responsibility provisions apply to all vessels engaged in any segment of the transportation of trans-Alaska pipeline oil between the terminal facilities of the pipeline and the port under the jurisdiction of the United States where that oil is first brought ashore.
 
 
 61
 Accordingly ... [t]hese rules shall apply to vessels which originally load the oil in Alaska, as well as to those vessels which receive such oil from any source and for any purpose, until such time as it is first brought ashore at a port under the jurisdiction of the United States.
 
 
 62
 42 Fed.Reg. 38,799 (July 29, 1977).
 
 
 63
 When the Coast Guard assumed the Commissioner's supervisory responsibilities, it joined its predecessor in extending section 1653(c) liability to trans-loaded oil. , .
 
 
 64
 Thus three separate agencies have uniformly interpreted section 1653(c) to apply to incidents like the American Trader spill. Such consistency weighs in favor of applying strict liability to the American Trader spill and affirming the district court. See (9th Cir.1985) ("When a statute is silent or unclear with respect to a particular issue, we must defer to the reasonable interpretation of the agency responsible for administering the statute.... We must defer to the agency's interpretation even if the agency could also have reached another reasonable interpretation, or even if we would have reached a different result had we construed the statute initially.").
 
 
 65
 The Fund argues that TAPAA's regulatory history is ambiguous, pointing to a subsequent amendment of the Department of the Interior's regulations. In 1987, the Department acceded to the Fund's request to change the definition of an "incident" for which damages may be recovered under the Act to read: " 'Incident' means a discharge of [Trans-Alaska pipeline] oil from a vessel which has loaded such oil at the terminal facilities of the Pipeline." 52 Fed.Reg. 24,182-83 (April 6, 1987). The Department explained that the new language "clarifies those discharges of oil for which the Fund may be liable by incorporating the language of the statute." Id. at 24,183.
 
 
 66
 Later, in response to a query about the impact of this amendment, the Department responded rather opaquely that it "recognizes that section 204(c)(1) [(c)(1) ] of the Trans-Alaska Pipeline Authorization Act applies to 'discharges of oil' from a vessel carrying TAPS oil, and did not intend to change the statutory application." 53 Fed.Reg. 3395 (Feb. 5, 1988).
 
 
 67
 The Department's failure to follow formal procedures in enacting this amendment suggests that it intended no substantive change in its earlier position. The Fund correctly notes, however, that this change casts doubt on the coherence and consistency of the Department's interpretation of the statute. Cf. (1991) ("As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views."). Nevertheless, because two other agencies have construed TAPAA to apply to trans-loaded oil and because the Department of the Interior has not formally retreated from its initial exposition of section 1653(c) liability, we hold that, as a whole, the regulatory framework favors imposing section 1653(c) liability for the American Trader spill. In we found unpersuasive an agency's informal "about-face position" on a matter of statutory construction preferring instead to follow the official regulations. Similarly in (9th Cir.1982), we disregarded regulations that were inconsistent with the agency's prior pronouncements and the purposes of the statute. We do likewise in this case, deferring to the consistent interpretation of two other agencies and the formally promulgated regulations enacted by the Department of the Interior.
 
 CONCLUSION
 
 68
 The parties have posed a difficult question of statutory construction. In the end, we agree with the district court that section 1653(c)'s strict liability provision encompasses trans-loaded oil. The Fund's cramped interpretation and truncation of section 1653(c) liability is inconsistent with TAPAA's comprehensive remedial purpose, as illustrated by the statute's language, structure, legislative history, and regulatory interpretation.
 
 
 69
 AFFIRMED.
 
 
 70
 . The district court's summary judgment ruling addressed other issues raised by the parties, such as exhaustion and the applicability of other maritime law. However, only the TAPAA liability issue was certified for interlocutory appeal. We therefore express no opinion on the remaining issues ruled upon by the district court.
 
 
 71
 . Indeed, (c)(1) affirmatively requires that its language be harmonized with, rather than read apart from, (c)(7). See Sec. 1653(c)(1) ("shall be strictly liable ... in accordance with the provisions of this subsection").
 
 
 72
 . Senator Hathaway's amendment read:
 
 
 73
 Sec. 206. (a) Notwithstanding the provisions of section 104(d) or any other provision of this Act or any other law, the holder of any rights-of-way granted pursuant to this Act for the construction of a pipeline for transporting oil and natural gas resources and the owner or operator of a terminal or vessel engaged in transporting oil or gas shall, except when caused solely by an act of war, be liable for all damages and injuries resulting from their activities in connection therewith, irrespective of fault or wrongdoing.
 
 
 74
 119 Cong.Rec. S24294 (July 17, 1973).
 
 
 75
 . Additionally, because supertankers constitute only about half of the ships loading at pipeline terminal facilities, TAPAA provides a rather blunderbuss vehicle for regulating supertanker oil spills. See 52 Fed.Reg. 23,522, 23,526 (June 22, 1987).
 
 
 76
 . It is worth noting that, if Congress disagrees with the agencies' interpretation, it has had fifteen years to amend the statute. The Fund cites no legislative criticism of the agencies' regulations, nor have we found any.
 
 
 77
 . The Department of the Interior's original definition of "incident" was "any occurrence, or series of occurrences, which causes a discharge of oil from a vessel." 42 Fed.Reg. 31,790 (June 23, 1977).
 
 
 78
 . Interestingly, the proposed amendment of the definition of "incident" submitted by the Fund to the Department of the Interior contained a very capacious interpretation of the Fund's responsibility for oil spills--a much more generous position than the Fund advances in this litigation. See 52 Fed.Reg. 24,182 (April 6, 1987) ("The purposes of the Fund is to pay for certain extraordinary damages--damages in excess of $14 million--caused by a vessel's discharge of oil being transported from the terminal facilities of the Trans-Alaska Pipeline System [TAPS] to other ports under the jurisdiction of the United States, where such [TAPS oil] has been shipped through TAPS.... The Fund was created as a secondary source of payment of damage claims resulting from an oil spill from a vessel transporting TAPS oil.").