**LINCOLN PROPERTIES, LTD., Plaintiff,**

v.

**Norman HIGGINS, et al., Defendants.**

**No. CIV S–91–0760 DFL GGH.**

United States District Court, E.D. California.

Dec. 21, 1992.

Michael C. Donovan, J. Martin Robertson, Joleen M. Grussing, David A. Hubb, John Antracoli, Ware & Freidenrich, Palo Alto, CA, and James A. Askew, Richard Archbold, and Dana R. Rivers, Neumiller & Beardslee, Stockton, CA, for Lincoln Properties, Ltd.

Brian M. Englund, Grossfeld, Dougherty & Grossfeld, Sacramento, CA, for Norman and Donald Higgins.

John F. Cheadle, County Counsel, Steven B. Bassoff, Deputy County Counsel, County of San Joaquin, Stockton, CA, and Robert C. Goodman, and John R. Capron, Feldman, Waldman & Kline, and Anthony Griffin, St. Clair, McFetridge & Griffin, San Francisco, CA, for Monroe H. Hess, Jr., Jeanne G. Hess and James A. Murray, Jr., each individually and dba Finest Care Cleaners (formerly Lincoln Center Martinizing and One Hour Martinizing).

William A. Gould, Jr. and Paul A. Dorris, Wilke, Fleury, Hoffelt, Gould & Birney, Sacramento, CA, for Hoyt Corp.

Ronald G. Aronovsky, Orrick, Herrington & Sutcliffe, San Francisco, CA, for County of San Joaquin.

James E. Ganzer, Ganzer & Williams, Stockton, CA, for A.A. Mederos.

Richard S. Baron and Andrew L. Finn, Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C., Detroit, MI, Robert B. Zaro, and Steven Mackey, Donahue & Callaham, Sacramento, CA, for Bennie Hein, individually and dba Norge Cleaners and Norge Cleaning Village; and Bonnie K. Crosby, individually and dba Norge Cleaners.

Jan Adam Greben, Scharff & Greben, Sacramento, CA, for Wilbert Moser, individually and dba Lincoln Village Cleaners.

Lynn S. Samuels, Zelle & Larson, San Francisco, CA, for Lumbermens Mut. Cas. Co. ex rel. Estate of Dwight Alquist, Deceased.

Stuart Lansing Smits, Lori J. Gualco, and David Frank, Trainor, Robertson, Smits & Wade, Sacramento, CA, for Jack Alquist, individually and dba Lincoln Village Cleaners, Village Cleaners, and Lincoln Village Cleaners, Inc.; and Estate of Dwight Alquist.

Roger W. Wenthe, McDermott, Will & Emery, Chicago, IL, and Mary Ellen Hogan and Tracy Loomis, McDermott, Will & Emery, Los Angeles, CA, for R.R. Street & Co., Inc.

### *MEMORANDUM OPINION AND ORDER*

LEVI, District Judge.

Plaintiff Lincoln Properties, Ltd. ("Lincoln") is the owner of Lincoln Center, a 110–store shopping center on a thirty-acre parcel of land in San Joaquin County near Stockton, California. Over the years some of Lincoln's tenants have been dry cleaners who used perchloroethylene ("PCE") in the course of their business. In December 1984 the County discovered that PCE had entered one of its wells in the vicinity of Lincoln Center. As a result of this discovery, Lincoln undertook further tests and determined that PCE had entered the groundwater and soil below Lincoln Center. The full extent of the contamination is not known. The exact way in which the PCE entered the groundwater is disputed, although some PCE was discharged from leaky sewer lines.

Lincoln concedes that because it is the owner of Lincoln Center it is liable in the first instance for the costs of cleanup under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* In this action, Lincoln seeks recovery under CERCLA of response costs and contribution from the dry cleaners and the County. Various dry cleaning defendants have also pled CERCLA claims against the County, Lincoln and the manufacturers of dry cleaning equipment.

The County now requests summary judgment and summary adjudication of facts as to all CERCLA claims asserted against it. The County's exposure to liability is based upon its alleged ownership of a portion of the leaking sewers under Lincoln Center and its undisputed ownership of various wells with cracked casings through which the PCE may have invaded the water table.

■ Section 107(a) of CERCLA authorizes recovery of costs incurred in responding to

hazardous waste problems, and § 113(f) allows a party to seek contribution from any person who is or may be liable under § 107(a). 42 U.S.C. §§ 9607(a), 9613(f). A § 107(a) claimant must show that:

1) The waste disposal site is a "facility" within the meaning of 42 U.S.C. § 9601(9);

2) There has been a "release" or "threatened release" of any "hazardous substance" from the facility;

3) The release or threatened release has caused the plaintiff to incur response costs that are "consistent with the national contingency plan"; and

4) The defendant falls within one of the four classes of persons subject to CERCLA liability. *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–53 (9th Cir.1989); *see* 42 U.S.C. § 9607(a). The four classes of "responsible parties" include the owners and operators of a "facility." [1] CERCLA liability is limited by three affirmative defenses set forth in 42 U.S.C. § 9607(b), *viz*, the act of God, act of war and "third party" defenses.

The County contends that it is not the "owner" or "operator" of a facility and that plaintiff and cross-claimants have failed to establish any "releases" of hazardous substances from County facilities, including sewers and wells. The County also invokes CERCLA's third party defense.

### I. *Owner/Operator Liability*

Plaintiff and the dry cleaning defendants maintain that as an owner and operator of portions of the Lincoln Center sewer system and the Lincoln Village Maintenance District

wells, the County is liable for releases of PCE from these "facilities." [2]

### A. *The County as "Owner"*

CERCLA imposes liability on the past or present owner of a facility at which hazardous wastes were released or disposed of 42 U.S.C. §§ 9607(a)(1), (2). An "owner" is "any person owning ... such facility." 42 U.S.C. § 9601(20)(A)(ii). The circularity of this definition "renders it useless." *Kaiser Aluminum & Chemical Corporation v. Catellus Development Corporation*, 976 F.2d 1338, 1341 (9th Cir.1992). However, the circularity "strongly implies ... that the statutory terms have their ordinary meanings rather than unusual or technical meanings." *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 156 (7th Cir.1988), *quoted in Kaiser Aluminum*, 976 F.2d at 1341. "Mere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack of control over the disposal activities." *U.S. v. A & N Cleaners and Launderers, Inc.*, 788 F.Supp. 1317, 1332 (S.D.N.Y.1992). In the absence of title, one may be an "owner" if one had "site control" or "authority to determine how the [property] was to be used." *Id.* at 1332–33 & n. 13.

The parties have provided considerable factual information concerning the Lincoln Center sewer system. There is no dispute that the majority of the sewer system is owned by Lincoln. However, there are two portions of the system that may implicate the County. These are the sewer lines beneath Benjamin Holt Drive and Gettysburg Place.

---

**1.** The four classes of responsible persons are defined as follows:

1) The owner and operator of a vessel or a facility;
2) Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
3) Any person who by contract, agreement, or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

4) Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.
42 U.S.C. §§ 9607(a)(1)–(4).

**2.** A CERCLA "facility" is a site or area where a hazardous substance is placed or has come to be located. 42 U.S.C. § 9601(9)(B); *see 3550 Stevens Creek Associates v. Barclays Bank*, 915 F.2d 1355, 1360 n. 10 (9th Cir.1990). The parties agree that the sewer system and wells are facilities.

1534

■ As to the Benjamin Holt segment, there is no evidence of County ownership. In 1947 the County was granted by deed a right of way "for highway and road purposes, and the installation of public utilities upon, along, over and across" the land that later became Benjamin Holt Drive. Lincoln is the owner of the fee interest in the land on which the right of way runs. It is well-settled that a right of way is simply an easement, and conveys no possessory interest in property. *See, e.g., Darr v. Lone Star Industries, Inc.,* 94 Cal.App.3d 895, 900–01, 157 Cal.Rptr. 90, 93 (1979). The sewer line itself was installed by Lincoln under the authority of an encroachment permit issued by the County. There is no evidence that the County ever acquired title to, or any possessory interest in, the sewer line. There is also no evidence that the County had control over this line or authority to determine how it would be used. The County is therefore not a past or present owner of the Benjamin Holt segment of the sewer line.

. ■ As to the Gettysburg Place segment, the County has conceded that it owned and continues to own a portion of the sewer below Gettysburg Place from Manhole No. 5 to Manhole No. 6. *See* Ex. A to County's Reply Memorandum (labeling this segment "County Owned Sewer System"). However, the County is not a former or present owner of the balance of the Gettysburg Place line. Gettysburg Place was dedicated to the County as a "public highway for road purposes" on October 25, 1948. Under Cal.Gov.Code § 66439(c),

> [a]n offer of dedication of real property for street or public utility easement purposes shall be deemed not to include any public facilities located on or under the real property unless, and only to the extent that, an intent to dedicate the facilities is expressly declared in the statement.

The offer of dedication of Gettysburg Place includes no such statement of intent to dedicate the sewer line or other public facilities. Thus, the dedication of Gettysburg Place to the County did not make the County an owner of the Gettysburg Place sewer lines

within the meaning of CERCLA. Similarly, the mere fact that the County moved the Gettysburg segment in response to a health threat in 1965 would not appear to impose owner liability on the County. By moving the segment, the County acquired neither title to nor control over this line.

Finally, as to Lincoln Village Maintenance District Wells 1 and 2,[3] it is undisputed that the County is the past and present owner of these wells within the meaning of CERCLA.

### B. *The County as "Operator"*

CERCLA also imposes liability on the past and present operators of a hazardous waste facility. The statutory definition of an "operator" again is circular: an operator is "any person ... operating such facility." 42 U.S.C. § 9601(20)(A)(ii). The caselaw, however, provides some guidance. In *Levin Metals v. Parr–Richmond Terminal,* 781 F.Supp. 1454, 1457 (N.D.Cal.1991), the court held that operator liability attaches to one who "actually participates in the operation of the facility at which hazardous substances are disposed of, exercises control over the company immediately responsible for the operation of that facility, or is otherwise intimately involved in the company's operations." Recently, in *Kaiser Aluminum,* the Ninth Circuit reaffirmed "the well-settled rule that 'operator' liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum,* 976 F.2d at 1341.

■ Here, none of the evidence provided regarding the Benjamin Holt and Gettysburg segments (other than the segment between Manholes 5 and 6) could lead the trier of fact to conclude that the County "participated in operation of" these sewer lines or "had authority to control" PCE in these segments. The dry cleaning defendants argue that the County's maintenance and repair work give rise to operator liability. There is some evidence that the County has performed maintenance work on the Lincoln

**3.** The County created the Lincoln Village Maintenance District in 1948 to levy assessments for

water, sewer and lighting systems and other improvements.

Center sewers, apparently at Lincoln's request. Workman Dep., 24:15–26:20. Since the early 1970's, the County has made fifteen to forty sewer maintenance and repair "visits" to Lincoln Center. *Id.*, 96:2–10. On this basis the dry cleaning defendants argue that the County is an operator, but cite no authority for so expansive an application of the statute. The maintenance and repair work performed at plaintiff's request did not give the County "authority to control the operations or decisions involving the disposal of hazardous substances at the site or the contents of the [sewers]." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.1992) (quoting district court opinion). If one who *builds* a treatment system is not an operator, neither is one who repairs a sewer line. *See Brookfield–North Riverside Water Commission v. Martin Oil Marketing, Ltd.*, 1992 WL 63274 at *7 (N.D.Ill.1992).

██ Plaintiff and the dry cleaning defendants also contend that various County ordinances make the County an "operator" of the Lincoln Center sewer system as a matter of law. San Joaquin County Ordinance § 5–3106 provides in pertinent part:

> [i]t shall be the district's responsibility to maintain all of the district's trunk collectors, laterals, branch pipelines, manholes, sewage disposal plants, storm drainage system, and district sewer line. It will be the property owner's responsibility to install the district sewer line and dedicate such line to the district after approval by the Building Inspector. It shall be the owner's responsibility to maintain, repair, and clean, at his own expense, all building sewer lines, cleanout and including the connection to the district sewer line.

McCormick Decl., Ex. B. "Building sewer line" is defined as:

> the part of the piping of a drainage system which begins at the end of the building drain, two (2) feet outside of the building foundation and extends to the district sewer line.

County Ordinance § 5–3100(i); *see* McCormick Decl., Ex. B. "District sewer line" is defined as:

> that part of the piping of a drainage system located in the public right-of-way or dedicated easement and extends from the connection to the main to its connection to the building sewer line at the public right-of-way or easement line.

County Ordinance § 5–3100(j); McCormick Decl., Ex. B. The definition of "district sewer line" may suggest that because Benjamin Holt Drive is a public right-of-way, the sewer lines underneath it are "district line," dedicated to the county maintenance district, and which the County must maintain. However, the Benjamin Holt and Gettysburg segments were never dedicated to the County. They did not become "district line" within the meaning of § 5–3106.[4]

Finally, the dry cleaning defendants maintain that the County resolutions creating the Lincoln Village Maintenance District and annexing the northern and southern parts of Lincoln Center obligated the County to "operate, maintain and repair" the Lincoln Center sewer lines. *See* Exhibits D, E and F to Park Decl. The court cannot agree. The June 28, 1948 resolution concerned only the sewers at Lincoln Village Unit No. 1, which is not part of Lincoln Center, and the subsequent resolutions annexing Lincoln Center do not address maintenance of the Lincoln Center sewer system. Thus, these resolutions are of no avail to cross-claimants.

## II. Releases of Hazardous Substances

Since the County owns several CERCLA "facilities"—District Well No. 1, District Well No. 2 and that part of the Gettysburg Place sewer line that connects Manholes 5 and 6—the next question is whether there is evidence of CERCLA "releases" from these facilities sufficient to withstand summary judgment. The County presents two arguments, one legal and one factual, in support of its position that there have been no such releases. First, the County maintains that as a matter of law the alleged leaking of PCE

---

4. The court also questions whether the County Ordinances could effectively override Cal.Gov. Code § 66439.

from its wells and sewers, even if it occurred, is not a release under CERCLA. Second, the County argues that as a factual matter there is no evidence that PCE has leaked from its portions of the sewer or from its wells.

## A. *Application of the Release Definition to Migratory Wastes*

 The County's legal argument addresses matters of some importance and controversy in CERCLA litigation. The County contends that the statute intends only a single release or source of a hazardous substance that has been released to the environment, and that "downstream" landowners ought not to bear the burden of clean-up for activities of their neighbors. Thus, in the circumstances here, the County argues that there was but one release when the dry cleaners placed the PCE into the sewer pipes. Any subsequent migration of the PCE to and from other lands was not a further release, in the County's view, so long as the adjoining facility owner remained passive.[5] Although the County's position may have some appeal in equity, it is inconsistent with the language and structure of the statute and it has been rejected by the weight of authority.

Under CERCLA, a "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). The statutory definition is broad and deliberately so. It uses a profusion of terms, all slight variations on much the same theme, to encompass the entire universe of ways in which hazardous substances may come to exist in the environment. Courts have given the term "release" a liberal reading, and have consistently rejected attempts to limit CERCLA's reach—or expand its narrow defenses—through restrictive interpretations of the term "release." *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 793 (D.N.J.1989);

*U.S. v. Hardage,* 761 F.Supp. 1501, 1510 (W.D.Okl.1990) (presence of substances in the soil, surface water, or groundwater of a site demonstrates a "release"). *See also State of N.Y. v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2nd Cir.1985) ("[w]e will not interpret section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intention otherwise").

 The statutory language does not suggest that the release of a substance occurs only once if the substance is migrating, or that liability is limited to the owner or operator that introduced the substance initially or was the source of the substance, or that a "passive" owner or operator is exempted from the Act. These concepts are not incorporated expressly or otherwise in the statutory definition of release. If Congress had intended such a limitation surely such language would appear in the statute.

 Nor is the "one source" or "passive owner exception" advocated by the County supported by the overall structure or purpose of CERCLA. The Act is structured to provide for broad coverage. An owner or operator of a facility, from which there has been a release, is subject to the Act, unless one of the narrowly stated defenses applies. Once liability is found, a court may apportion the cleanup costs to reflect relative responsibility. *See* 42 U.S.C. § 9613(f)(1) ("the court may allocate response costs among liable parties"). The "passive owner" and one source concepts advocated by the County effectively would introduce, through the definition of "release," new defenses to liability. Congress, however, carefully has set forth specific and limited defenses to liability in a separate statutory section. For example, the Act provides a defense to an owner when a third person is the "sole cause" of the release in circumstances specified in the statute. This narrow provision is the only causation based defense provided by the Act. *See U.S. v. Kramer,* 757 F.Supp. 397, 411 (D.N.J. 1991). Yet the County would have the court create a new, ill-defined causation defense

---

5. The County argues that "the downgradient passive migration of contaminants to *other* properties [cannot] create a potentially limitless series

of 'releases' and 'facilities.'" County's Reply Memorandum, 27:2–4.

based on the supposed "passivity" of an adjoining owner. Since many environmental consequences stem from failures to act, the County's proposed exemption for "passive" owners predictably would foster an elaborate case law distinguishing omissions that may lead to liability from those that do not.[6] But such distinctions will involve concepts, such as causation or knowledge, that are either foreign to the Act or are explicitly provided for in a limited fashion in the defense section of the Act.

■ CERCLA is a strict liability statute with few defenses. One of its primary purposes is to encourage cleanup. *See e.g., U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3rd Cir.1992). It envisions that sometimes the cleanup must be paid for by those least responsible because those who are most responsible lack funds or cannot be found. It tempers its severity with an apportionment principle and with limited defenses that are rarely available. *See* 42 U.S.C. §§ 9607(b), 9613(f). The County's effort to limit liability to the entity that introduced the substance and to exempt "passive" owners would markedly expand the available defenses, reduce the efficacy or aggressiveness of the statute, and introduce equitable considerations that are addressed in other portions of the Act.

A hypothetical example illustrates the consequences of the County's position. Polluter dumps hazardous wastes into the soil at his property. The wastes migrate through a drainage ditch to Neighbor's land and form a pond. The contaminants then pass from the pond into the water table. Under the County's theory, Neighbor need take no action to clean up its property, and cannot be liable under § 107(a), even if Neighbor had knowledge all along of the migration of the waste

and took no steps to stop it. This result would frustrate CERCLA's policy of encouraging voluntary private action to remedy environmental hazards. *Nurad*, 966 F.2d at 845; *see also Shore Realty*, 759 F.2d at 1044–45. "A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind." *Nurad*, 966 F.2d at 845–46.[7]

Moreover, the weight of authority is against the one release or passive/active concepts advocated by the County.[8] In *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir.1988), developers spread contaminated soil over a site during construction of a housing subdivision. The Fifth Circuit rejected the "one release" theory and held that the developers could be liable under CERCLA notwithstanding the fact that they did not introduce the hazardous substances into the environment in the first place. The court noted that the:

> definition of disposal does not limit disposal to a one-time occurrence—there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings.

*Id.* The Ninth Circuit followed *Tanglewood* in *Kaiser Aluminum* on similar facts. *See* 976 F.2d at 1341–42.[9]

Similarly, courts have insisted on the distinction between the limited causation based defenses in section 9607(b) and the broad provision for liability in the other portions of CERCLA. In *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir.1985), the court held that the owner of a contaminated facility was liable under § 107(a) notwithstanding the fact that the owner did not

---

6. At oral argument, counsel for the County suggested that whether an owner could be deemed "passive" might depend on the owner's degree of knowledge. The Act, however, is a strict liability statute.

7. Neighbor, of course, can sue Polluter for recovery of response costs or contribution, and may be entitled to invoke the third party defense in any action against Neighbor.

8. *But see Brookfield–North Riverside Water Commission v. Martin Oil Marketing, Ltd.*, 1992 WL

63274 (N.D.Ill. March 12, 1992); *Ecodyne Corp. v. Shah*, 718 F.Supp. 1454 (N.D.Cal.1989).

9. The County's attempt to distinguish these cases is unavailing. In *Tanglewood* and *Kaiser Aluminum*, both "disposals" occurred at the same site. However, the courts' analyses do not depend on this fact and nothing in the statute suggests that release may be defined differently depending on where the property lines are. Furthermore, if the "site" at issue in this case is Lincoln Center, the County-owned wells and sewer line and the dry cleaning facilities *are* part of the same site.

"cause" the release. The *Shore Realty* court observed that "interpreting section 9607(a)(1) as including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b), each of which carves out from liability an exception based on causation." *Id.* at 1044; *see also U.S. v. Monsanto Co.*, 858 F.2d 160, 169–70 (4th Cir.1988) and *State of Ohio v. U.S. Department of the Interior*, 880 F.2d 432, 471 (D.C.Cir.1989). And in *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992), the court expressly rejected the "passive owner" exemption the County urges. The *Nurad* court recognized that the statutory definition of "disposal" encompasses "spilling" and "leaking," and concluded that "hazardous waste may leak or spill without any active human participation." *Id.* at 845.[10] The definition of "release" at issue here is even broader than that of "disposal"[11] and includes additional terms such as "emitting" and "escaping" that imply no active human participation.[12] *See also Stanley Works v. Snydergeneral Corp.*, 781 F.Supp. 659, 662–64 (E.D.Cal.1990) (migration is "release").

In short, as a matter of law, the County may be liable for releases from its facilities—*viz*, its portion of the sewer and its wells.

B. *Evidence of Release from Wells and Sewer*

▮ There is evidence of releases from the County's facilities sufficient to withstand summary judgment. First, as to Wells 1 and 2, there is evidence that PCE entered into both wells through cracks in the well casing. However, there is no direct evidence that PCE (or any other contaminant) was released *from* the wells "into the environment." *See* 42 U.S.C. § 9601(22). The dry cleaning defendants argue that the cracks in the well casing permitted PCE to seep into the wells

at the uppermost level in the water table and that once in the wells the PCE was able to migrate to the lowest level of the water table. The County draws its drinking water from this lowest level, where the wells were screened and open to the water table. Although there is no direct evidence that PCE migrated from the wells to the water table, this is a fair inference given that PCE is heavier than water and that the well bottoms are open.

Further, the County may be liable for response costs incurred as a result of the *threat* of release from the wells. *See* 42 U.S.C. § 9607(a) ("the owner ... of a facility ... from which there is a release, *or a threatened release* which causes the incurrence of response costs, of a hazardous substance, shall be liable") (emphasis added); *see also Shore Realty*, 759 F.2d at 1045.[13] Plaintiff's expert geohydrologist, Dr. Anne Farr, has stated that

[c]hemicals can migrate or transfer between water-bearing zones[14] through groundwater wells which allow non-natural hydraulic communication (mixing) of groundwater from different water-bearing zones. A break in a groundwater well casing can allow groundwater to enter into a well in one zone and mix with groundwater from another zone. Placement of a perforated section (well screen) in a groundwater well across more than one water-bearing zone can allow groundwater to enter into a well in one section and mix with groundwater from another zone. Improper sealing of a groundwater well casing can allow groundwater to migrate from upper water-bearing zones along the side of a well to lower aquifer zones. It is my opinion that groundwater containing PCE ... has been transferred from Zone "A" to Zone "C" through breaks in LVMD Well

---

10. The Ninth Circuit recently declined to reach the "passive migration" issue. *Kaiser Aluminum*, 976 F.2d at 1342, n. 7.

11. *See* 42 U.S.C. §§ 9601(29), 6903(3).

12. *Nurad* involved *prior* facility owners, who are statutorily liable only if "disposals" occurred during their ownership. *See* 42 U.S.C. § 9607(a)(1).

13. The CERCLA claims pled against the County refer to "releases," rather than "threatened releases." However, the court construes the claims to encompass the threat of release.

14. The ground below Lincoln Center contains three district water-bearing zones, or aquifers. Zone "A" is 35 to 65 feet below the surface; Zone "B" is 70 to 150 feet underground; and Zone "C" is 170 to 260 feet below the surface.

Nos. 1, 2, and 6. All three LVMD wells are no longer used for water supply, but remain as conduits for transport of groundwater containing PCE ... Until the wells are destroyed ... these wells continue to act as potential pathways for chemicals to enter the "C" water-bearing zone.

Farr Preliminary Injunction Decl., 28:4–26. The trier of fact could infer from this evidence that there is a threat of PCE release from Wells 1 and 2 into Zone "C." Thus, the County is not entitled to summary judgment on this issue.

As to the sewer line beneath Gettysburg Place linking Manhole 5 with Manhole 6, the County contends that there is no evidence of PCE releases into the environment through leaks in this line (or any other Gettysburg line). The County correctly notes that plaintiff and the dry cleaning defendants cite to no evidence of contaminated soil or groundwater samples attributable to this line. However, there is substantial evidence of contamination of the soil and groundwater underneath Lincoln Center generally, and the trier of fact could infer that some of this PCE was released through leaks in the line at issue. This inference is bolstered by the proximity of this line to some contaminated groundwater [15] and a contaminated well (Well No. 1).[16]

The County is correct that there is no *direct* evidence that PCE leaked from the line. However, Pacific Pipe Survey's report suggests that three joints in the line between Manholes 5 and 6 were sealed because they leaked air. Frank Decl., Ex. A. If air escaped through these joints, PCE could also have seeped out. Again, the question is one of drawing inferences on summary judgment. "[W]e must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine,* — U.S. —, —, 111 S.Ct. 2419, 2435, 115 L.Ed.2d 447 (1991). Guided by this principle, the court finds that plaintiff and the dry cleaning defendants

have met their burden of showing a genuine factual dispute as to releases from the County-owned portion of the Gettysburg Place line.

### III. *Third Party Defense*

■ An otherwise liable party may avoid CERCLA liability only by establishing one of the three affirmative defenses set forth in 42 U.S.C. § 9607(b). *See U.S. v. Azrael,* 765 F.Supp. 1239, 1242 (D.Md.1991). These defenses are construed narrowly to further the statute's broad remedial purposes. *Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532, 1540 (W.D.Mich.1989). The County invokes the third party defense, under which a CERCLA defendant, otherwise liable, is provided a complete defense to liability if the release:

[was] caused solely by an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that

(a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all the relevant facts and circumstances, and

(b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3). To gain the defense, the County must establish:

1) that a third party was the sole cause of the release of hazardous substance;

2) that the third party was not the County's employee or agent;

3) that the act or omission of the third party causing the release did not occur in connection with a contractual relationship,

---

**15.** Monitoring Wells 4 and 5 are located near the line. *See* Plaintiff's Preliminary Injunction Ex. 11 at Figure 11. Samples taken from these monitoring wells show significant concentrations of PCE. *Id.* at Table 5.

**16.** *See* Plaintiff's Preliminary Injunction Ex. 11 at Figure 3.

existing either directly or indirectly, with the County;

4) that the County exercised due care with respect to the hazardous substance concerned; and

5) that the County took precautions against foreseeable acts or omissions of the third party. *Kelley*, 727 F.Supp. at 1539–40. The County must prove each of these elements by a preponderance of the evidence. *Id.* With the exception of the second requirement, all of these elements are contested.

### A. Sole Cause

The interpretation of the sole cause requirement presents an important question as to which there is little guidance in the statute, case law or legislative history. It is unclear whether Congress intended to make reference to established concepts of causation, and, if so, which ones. Adopting a notion of proximate cause, the County argues that any contamination for which it might otherwise be liable was caused solely by the acts or omissions of third parties, *viz*, the dry cleaners' discharges of PCE into Lincoln's sewer lines.

■■■■■ The starting point of inquiry is the provision's plain language. *See Slaven v. BP America, Inc.*, 973 F.2d 1468, 1471 (9th Cir.1992). Where the words of a statute are unambiguous, the inquiry is complete. *Connecticut National Bank v. Germain*, —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). But the language of the statute must be examined in light of the "overall structure and purpose of the legislation." *Slaven*, 973 F.2d at 1472. Furthermore, the court may look to the legislative history for guidance if the terms are ambiguous or if application of the plain language

compels a result that is "difficult to fathom." *Id.* at 1473.

The phrase "caused solely by" is ambiguous, particularly when read in context of the entire section. As noted above, the concept of causation is a subtle one in the law and has different meanings in different contexts. One could read the provision strictly such that virtually any evidence of a release from a defendant's facility would preclude assertion of the third party defense, since the release in such case would not be caused "entirely" by third parties. However, this construction, which is similar to "but for" causation in tort law, would eliminate the third party defense. The defense is provided to one who is already liable for a release. If the fact of a release amounts to causation then the defense is a nullity. Moreover, the provision contemplates that the defendant claiming the defense "exercised due care with respect to the hazardous substance concerned" and "took precautions." These aspects of the defense make little sense if causation is interpreted so literally as to forbid any contact with the hazardous substance which may have permitted or facilitated a release.[17]

The CERCLA legislative history as to the "caused solely by" language is not helpful in defining its meaning. *See* H.R.Rep. No. 1016(I), 96th Cong., 2nd Sess. 34 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6137 ("[i]f a defendant establishes that a release or threatened release of hazardous waste was caused solely by an act of God or an act of war, negligence on the part of the United States, an act or omission of a third party or any combination of the foregoing, he shall not be held liable"). The United States Environmental Protection Agency has not promulgated any regulations interpreting the third-party defense. The case law is similarly undeveloped.[18] However, CERCLA

---

**17.** These provisions of the defense are also inconsistent with the dry cleaners' suggestion at oral argument that the defense is available only to the victims of "midnight dumpers"—criminal trespassers who release hazardous substances onto the property of innocent, unsuspecting facility owners.

**18.** CERCLA case law sheds little light on the meaning of "caused solely by." *See, e.g., U.S. v.*

*Stringfellow*, 661 F.Supp. 1053, 1061 (C.D.Cal. 1987) (§ 107(b)(3) applies "only where a totally unrelated third party is the *sole* cause of the release"); *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1540 (W.D.Mich.1989) (third party must be *sole* cause of release and concomitant harm); *U.S. v. Marisol, Inc.*, 725 F.Supp. 833, 838 (M.D.Pa.1989) (allegation that third party was *proximate* cause of release stricken as insufficient statutory defense).

§ 107(b), including the "sole cause" language, is modeled on the Clean Water Act's defense provisions. *See* H.R.Rep. No. 253(I), 99th Cong., 2nd Sess. 288 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2963; *see also* Michael M. Wenig, *Strict Liability Under the Clean Water Act*, 10 Colum.J.Envtl.L. 149, 184–85 (1985) ("Congress passed CERCLA to update and consolidate liability provisions in the [Clean Water Act] and other federal statutes relating to toxic wastes ... [t]he scheme of liability in section 107 of CERCLA generally resembles that in section 311 of the [Clean Water Act]").[19] The case law interpreting the Clean Water Act's sole cause language is helpful.[20]

> Under the Clean Water Act,
>
> [e]xcept where an owner or operator of a [vessel or onshore or offshore facility] can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent ... [such owner or operator shall be liable for costs incurred by the government in removing the hazardous substance or oil].

33 U.S.C. §§ 1321(f)(1), (2), (3). This provision has been construed in three distinct ways. First, some courts have held that the Clean Water Act's third-party defense creates a fault-based standard. In *U.S. v. Bear Marine Services*, 509 F.Supp. 710 (E.D.La. 1980), the court observed that

> [t]he legislative history makes it clear that the exceptions are to be strictly construed and that they must, in fact, be *sole* causes of the discharge. **The discharger must be totally free of fault;** any fault on the part

of the discharger vitiates the 'sole cause' exception.

*Id.* at 715 (emphasis added). The *Bear Marine* court relied on the following passage from the Clean Water Act's legislative history:

> Finally, the committee considered the question of a discharge which occurred solely due to an act of a third party. Among such acts would be a discharge caused when a vessel collided with another vessel which was secured to a dock.
>
> The committee determined that while the owner or operator should not be liable if he could prove that a discharge was caused by one of these acts, it was also necessary that such exemptions be allowed only when the owner or operator proved the discharge to be solely the result of one of the exceptions. **Any culpability on the part of the owner or operator would vitiate the exception.**

*Id.* at 715, n. 3 (quoting Report of the Senate Committee on Public Works, S.Rpt. 91–351, August 7, 1969, at 6) (emphasis added).

Other courts have distinguished between a defendant's *acts* and his *omissions*. For instance, in *Reliance Insurance Co. v. United States*, 677 F.2d 844, 230 Ct.Cl. 390 (1982), the Court of Claims noted that under its prior precedents, the third party defense was available to an owner or operator whose omissions were not negligent.[21] However, as to a defendant's affirmative acts,

> there is no standard of liability ... Any conduct, however, slight, on the part of an owner or operator contributing to a spill would negate relief, even though such conduct might have operated in concert with greater third-party conduct to produce the spill. In other words, only where the own-

---

**19.** Since CERCLA's enactment, other environmental statutes have also borrowed the "caused solely by" language in the context of third party defenses. *See, e.g.*, 16 U.S.C. § 1443(a)(3); 33 U.S.C. § 2703(a).

**20.** During final consideration of CERCLA by the House of Representatives, Representative Florio stated that "[s]ince reference to [Clean Water Act] section 311 standards of liability is necessary only where not superseded by standards of this bill, these defenses, and not those of section 311, will control." 126 Cong.Rec. 31,965 (1980).

This statement, however, does not preclude the court from looking to the Clean Water Act for guidance as to the meaning of "caused solely by."

**21.** *Reliance* actually involved construction of § 311(i) of the Clean Water Act, 33 U.S.C. § 1321(i), which allows an owner to recover the costs of cleanup from the United States if the owner proves that one of the § 1321(f) defenses was the sole cause of the discharge.

er's or operator's conduct was so indirect and insubstantial as to displace him as a causative element of the discharge would he be relieved of responsibility and, correspondingly, financial liability.

*Id.* 677 F.2d at 848–49.[22]

Finally, under the strictest construction of the third party defense, fault is entirely irrelevant regardless of whether an act or an omission is at issue. *See U.S. v. West of England Ship Owner's Mutual Protection & Indemnity Association (Luxembourg),* 872 F.2d 1192, 1195–97 (5th Cir.1989) ("it is clear that section 1321(f)(1) is causation-based and not fault-based ... we reject the defendants' argument that proof of non-negligence alone is enough to satisfy [the statute]");[23] *see also Kyoei Kaiun Kaisha Ltd. v. M/V Bering Trader,* 795 F.Supp. 1054, 1056 (W.D.Wash. 1991). According to *West of England,* a defendant whose conduct is a proximate cause of the discharge is not protected by the third party defense. *West of England,* 872 F.2d at 1198. However, "more than 'but for' causation is necessary for the defendants to be liable ... In determining proximate cause, the trier of fact must decide whether the ... discharge was, at least to some degree, foreseeable." *Id.* at 1198–99.

The *Bear Marine* "fault-based" approach seems unhelpful in the context of CERCLA § 107(b). CERCLA's third party defense incorporates due care provisions that would be unnecessary if "caused solely by" is construed as a negligence standard.[24] Moreover, the *Reliance* distinction between acts and omissions also seems inapposite. By requiring the defendant to take precautions and exercise due care, the CERCLA third party defense addresses acts and omissions

of the defendant without suggesting a different standard for acts than for omissions, or a reason to vary the interpretation of causation depending on whether the defendant acted or failed to act.

■■■■ In keeping with *West of England* and some of the language in *Reliance,* the court holds that "caused solely by," as used in CERCLA, incorporates the concept of proximate or legal cause. If the defendant's release was not foreseeable, and if its conduct—including acts as well as omissions—was "so indirect and insubstantial" in the chain of events leading to the release, then the defendant's conduct was not the proximate cause of the release and the third party defense may be available. This interpretation seems most consistent with the language of CERCLA's third party defense provision. It also has the advantage of providing a consistent interpretation of language now frequently used, without explanation, in the defense sections of various environmental statutes.

■■■ Under this proximate cause standard, the County has established that any releases or threats of release from County facilities were "caused solely by" third parties. Even assuming that PCE leaked from the County-owned sewer line, there is no evidence of conduct by the County that contributed to the releases. In fact, the County took reasonable precautions to prevent releases of hazardous substances. *See infra* at 1543–1544. The releases were not foreseeable. *See infra* at n. 25. Similarly, to the extent that there is a threat that PCE will be released from the wells, the County's conduct

---

**22.** *See also Cities Service Pipe Line Co. v. U.S.,* 742 F.2d 626, 627 (Fed.Cir.1984) ("[a]n affirmative act of an owner which is a contributing cause of a discharge precludes the act or omission of a third party from being the sole cause thereof"). However, the phrase "caused solely by"

cannot be taken literally ... To attach liability based on conduct inherent in [a defendant's] business activity, which is not abnormally dangerous, would lead ... to an 'anomalous' result.

*Id.* at 627 (citing *Reliance* and *Travelers Indemnity Co. v. United States,* 230 Ct.Cl. 867, 868, 1982 WL 1411 (1982)).

**23.** The *West of England* court recognized the "culpability" language in the Senate Committee Report quoted by the *Bear Marine* court, but observed that this legislative history established only that non-negligence was necessary but not sufficient to maintenance of the defense. 872 F.2d at 1196.

**24.** The Clean Water Act third party defense does not include these due care and negligence limitations.

was "so indirect and insubstantial" that it has been displaced as a causative element.

The County may be a "but for" cause of releases or threatened releases. But for the wells there may be no threat that PCE will be released into Zone "C," the deepest of the water zones. Similarly, but for the sewer leaks, some PCE may not have been released into the soil and groundwater. But there is no evidence that the County could or should have foreseen the releases.[25] *Cf. West of England,* 872 F.2d at 1199; *see* W. Page Keeton et al., *Prosser and Keeton on Torts* §§ 42, 43 (5th ed. 1984) (under doctrine of proximate cause, defendant should not be liable for results it could not reasonably have been expected to foresee). To hold the County liable for its "normal" activities in owning and maintaining the sewer line and wells would be an anomalous result. *See Cities Service,* 742 F.2d at 627. The County was therefore not a proximate or contributing cause, and the releases or threats of release were "caused solely by" third parties within the meaning of § 107(b).

### B. *Contractual Relationship*

The dry cleaners argue that the County cannot assert the third party defense because it was in a contractual relationship with Lincoln. They argue that the County's creation of the Lincoln Village Maintenance District and the subsequent annexation of Lincoln Center into the district gave rise to a contractual relationship between Lincoln and the County. According to the dry cleaners, there is also "at least an indirect" contractual relationship between themselves and the County because the dry cleaners' leases "passed through" to them the cost of the District assessment.

■■■ The term "contractual relationship" "includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession." 42 U.S.C. § 9601(35)(A). One who opposes assertion of the third party defense must show "some-

thing more than a mere contractual relationship." *Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp.,* 964 F.2d 85, 89 (2nd Cir.1992). Thus, "a landowner is precluded from raising the third-party defense only if the contract between the landowner and the third party somehow is connected with the handling of hazardous substances." *Id.* at 89; *see also Shapiro v. Alexanderson,* 743 F.Supp. 268, 271 (S.D.N.Y.1990).

■■■ The dry cleaners' arguments are unpersuasive. Notwithstanding the dry cleaners' characterization of the *"quid pro quo"* exchange by which a parcel pays an assessment to and receives services from a maintenance district, there is simply no authority for the proposition that this is the "contractual relationship" envisioned by Congress. As the County notes, the apparent *quid pro quo* is in fact not mutual consideration but simply a product of equal protection requirements. *See Spring St. Co. v. Los Angeles,* 170 Cal. 24, 30, 148 P. 217 (1915). The County *unilaterally* imposes an assessment on land in the district and determines the apportionment of benefits among assessed properties. Thus, the County's creation of the District bears none of the hallmarks of a contract, and did not beget a "contractual relationship." Furthermore, even if the dry cleaners were correct, any contract between the County and Lincoln could not be said to be "connected with the handling of hazardous substances."[26]

### C. *Due Care and Precautions*

■■■ The County must show that it exercised due care with respect to PCE "in light of all relevant facts and circumstances" and that it took precautions against the "foreseeable acts or omissions" of third parties. In 1983, the California legislature enacted Assembly Bill ("AB") 1803, which required counties to test their wells for PCE and related solvents. The County promptly tested its wells, and upon discovering contamina-

---

25. The County cannot be expected to "foresee" that its ordinance prohibiting the discharge of cleaning solvents will be violated.

26. Because there is no contractual relationship between Lincoln and the County, there is also no "indirect" contractual relationship between the dry cleaners and the County by virtue of the dry cleaners' leases.

tion, it performed videotaped inspections and sealed the casing of Well No. 1. The County subsequently took the contaminated wells out of service and is now destroying them "in a manner intended to prevent the possible flow of contamination through those wells." Delucchi Decl., ¶ 7. The County also tested, inspected and sealed joints in the sewer lines near Well No. 1 in an effort to protect the well. *Id.*

The County has also apparently exercised due care and taken reasonable precautions with respect to its sewer system. The County's sewer lines were built and have been maintained in accordance with industry standards. *Id.*, ¶ 8. A County ordinance prohibits the discharge of cleaning solvents into the sewer. *See* San Joaquin County Ordinance § 5–3105. None of the dry cleaners ever applied for permission to discharge hazardous substances. Delucchi Decl., ¶ 4.c. Violations of the law are not "foreseeable acts"; thus, the County did take reasonable precautions.

Lincoln argues that the questions of due care and reasonable precautions may not be resolved on summary judgment. The court has some evidence on these issues, although the record is perhaps not as complete as it could be. However, the County has come forward with sufficient evidence regarding due care and precautions to meet its initial burden on summary judgment, and plaintiff and the dry cleaners have not met *their* burden of showing specific facts that establish the existence of a genuine issue for trial.[27]

In sum, the County has established by uncontroverted evidence all elements of the third party defense. Thus, pursuant to 42 U.S.C. § 9607(b)(3), the County is not subject to liability on the CERCLA claims against it.

### IV. *Conclusion*

The County's motion for summary judgment is granted. The County may be otherwise liable for releases of hazardous sub-

stances from its facilities. However, CERCLA's third party defense precludes such liability.

IT IS SO ORDERED.

---

27. The testimony of the dry cleaners' sewer expert, Garr Jones, does not create a genuine dispute as to any material fact. Mr. Jones testified about the Lincoln sewers generally, not the part of the Gettysburg Place Segment owned by the County. Jones Dep., 69:9–70:2. Jones admitted that he had no knowledge of the County's inspection and maintenance practices. *Id.*, 126:15–17.