**UNITED STATES of America, Plaintiff,**

v.

**Robert W. MEYER, Jr., Defendant.**

**No. 1:97–CV–526.**

United States District Court, W.D. Michigan, Southern Division.

Aug. 26, 1999.

---

Kurt N. Lindland, W. Francesca Ferguson, Asst. U.S. Attorney, U.S. Attorney's Office, Grand Rapids, MI, Elliot M. Rockler, Bruce S. Gelber, Randall M. Stone, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, for Plaintiff.

John D. Dunn, Dean Sean Schindler, Warner Norcross & Judd, LLP, Grand Rapids, MI, Richard J. Quist, Grand Rapids, MI, T. Michael Doyle, Doyle Group Attorneys, PC, Lansing, MI, Richard J. Quist, Richard J. Quist Law Office, Lowell, MI, for Defendant.

## OPINION

ENSLEN, Chief Judge.

In this action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, the United States seeks to

recover its response costs for containment and remediation actions at a contaminated site in Cadillac, Michigan. Both the United States and Defendant Robert W. Meyer, Jr. have filed motions for summary judgment. After considering the issues, the Court will grant the United States' Motion for Partial Summary Judgment and deny Meyer's motion.

## FACTS

This case involves a Superfund site located in Cadillac, Michigan. The property in question ("the Property") was owned by R.W. Meyer, Inc. at all times relevant to this litigation. Robert W. Meyer, Jr. was an officer and shareholder of R.W. Meyer, Inc., a family-owned business, between 1964 and 1982. He was also an employee of a second family business, R.W. Meyer Construction Company. R.W. Meyer, Inc. intended to develop the Property as a mini-industrial park. To that end and to service an existing tenant, R.W. Meyer Construction Company built a private sewer line along the perimeter of the property ("the perimeter sewer line"), which connected with the municipal sewer system. Meyer supervised and assisted with the construction of the perimeter sewer line. Because the grade at the site did not allow complete drainage of the perimeter sewer line to the municipal sewer, some of the waste water in the perimeter sewer line routinely leaked into the ground through joints loosely sealed with Oakum, a tar substance. Meyer was aware that this would occur.

In the early 1970s, the Cadillac Chamber of Commerce approached Meyer regarding leasing a portion of the Property to Northernaire Plating Company ("Northernaire"), an electroplating business. Meyer, on behalf of R.W. Meyer, Inc., negotiated a lease with Northernaire. Under the lease, R.W. Meyer, Inc. agreed to construct a building on the Property for Northernaire's use and to provide the wa-

ter, sewer, plumbing and heating for the building. R.W. Meyer, Inc. contracted with Meyer Construction to perform this task.[1] Meyer was an employee, shareholder and member of the Board of Directors for Meyer Construction Company and supervised the construction of the Northernaire building and a sewer line connecting sinks and a bathroom within the building ("the eastern sewer line") to the perimeter sewer line. In addition, floor drains were installed in the building, which drained directly into the ground, and, at some later point, a second sewer line ("the northern sewer line") was extended from the area around the floor drains to the perimeter sewer line. Meyer denies installing either of these drainage systems, although he admits that the floor drains were in place when he poured the concrete floor in the Northernaire building.

Northernaire used the floor drains and the northern sewer line to dispose of waste water from the electroplating process. The United States asserts that Northernaire told Meyer it intended to dispose of rinse water through the floor drains and into the sewer; Meyer states that Northernaire promised to dispose of all industrial wastes offsite. Throughout the period of the lease, Meyer maintained and repaired the eastern and perimeter sewer lines and, at some point, built a manhole at the intersection of the eastern sewer line and the perimeter sewer line to facilitate these services. At the request of Donald Rennie, the Supervisor of the City of Cadillac's Wastewater Treatment Plant, Meyer installed a sampling manhole on the perimeter sewer line. Meyer was also the primary contact for Northernaire and visited the site approximately six times throughout the course of the lease.

In 1975 or 1976, the contaminant levels in the effluent from the Northernaire facility became unacceptably high. Rennie informed Meyer of the violations no later than 1978. Later that year, the City of

---

1. Meyer Construction was a second family-held construction company which was creat-ed when R.W. Meyer Construction, Inc. dissolved.

Cadillac barred Northernaire from using the municipal sewer system and plugged the connection between the Northernaire building and the municipal sewer. By 1981, Northernaire was out of business. In 1982, the Michigan Department of Environmental Quality ("MDEQ") began investigating the Property and, in 1983, the United States Environmental Protection Agency ("USEPA") joined the investigation. MDEQ found elevated levels of cyanide, lead, nickel, chromium, copper and zinc in the soil. These hazardous materials are commonly associated with the electroplating industry. USEPA found elevated levels of chromium and cadmium in the soil surrounding the northern sewer line and in sediment in the sewer manholes and elevated levels of hexavalent chromium in the groundwater under the Property.

In 1983, USEPA placed the Property on the National Priorities List and took various removal and clean up actions in response to the contamination on the Property. Subsequently, the United States filed a cost recovery action against various parties, including R.W. Meyer, Inc. Judgment was eventually entered against R.W. Meyer, Inc. The United States then filed a second suit which named Meyer individually among the defendants. The other defendants to this suit entered into a Consent Decree with USEPA on September 4, 1998. The United States and Meyer have filed cross-motions for summary judgment on liability.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994). The court must view the facts presented in the light most favorable to the non-moving party, *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and draw all reasonable inferences in the nonmovant's favor, *Rakoczy v. Traveler's Insurance Co.*, 959 F.Supp. 777, 781 (E.D.Mich.1997).

A party seeking summary judgment must specify the basis upon which judgment should be granted and identify that portion of the record which demonstrates the absence of a genuine issue of material fact. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this burden is met, the non-moving party must provide facts, supported by evidence in the record, "upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## DISCUSSION

To demonstrate Meyer's liability under CERCLA, the United States must show that there has been a release or threatened release of a hazardous substance from a facility which caused the United States to incur response costs and that Meyer meets the definition of a potentially responsible party ("PRP"). *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999). The United States asserts that hazardous substances were released from the sewer lines on the Property, which constitute a facility separate from the Northernaire plant, and that Meyer qualifies as a PRP because he was the former operator of the sewer lines.

■ CERCLA defines both facility and release broadly. A facility is defined, in part, as "any site or area where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). Courts have interpreted this language to

mean that "facility" includes "every conceivable place where hazardous substances come to be located." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151 (1st Cir.1989). Because hazardous substances may come to be located in several discrete locations in a given case, there may be several "facilities" related to a single hazardous waste discharge or disposal. *Brookfield–North Riverside Water Commission v. Martin Oil Marketing, Ltd.*, No. 90 C 5884, 1992 WL 63274, *5 (N.D.Ill. March 12, 1992). The undisputed facts show that, between 1972 and 1978, Northernaire discharged waste waters containing hazardous substances into at least one of the sewer lines exiting its building and that those hazardous substances were deposited in the adjoining sewer lines. Accordingly, the sewer lines, collectively and individually, qualify as a CERCLA "facility."

A release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment ...." 42 U.S.C. § 9607(22). Sampling conducted by and for USEPA and MDEQ showed contaminated soils along both the eastern and northern sewer lines and in the vicinity of the floor drains and elevated chromium levels in sewer sediments. In addition, effluent sampling conducted in the perimeter sewer line, which was not properly sealed to prevent leaks, recorded elevated levels of chromium and other hazardous materials. Taken together, these facts demonstrate a release from the northern and eastern sewer lines and the floor drains and a likely release from the perimeter sewer line.

The United States has also provided ample evidence that it incurred response costs as a result of these releases or threatened releases. Among other things, the United States removed the northern sewer line and floor drains, excavated and disposed of contaminated soils surrounding the excavations and contaminated sewer sediments, and implemented a groundwater extraction and treatment system.

Determining whether Meyer can be considered an operator is more complicated. CERCLA extends liability to former owners and operators, defined as "any person[s] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Operator liability under CERCLA "is concerned primarily with direct liability for one's own actions," *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 1886, 141 L.Ed.2d 43 (1998), and extends to any person who "directs the workings of, manages, or conducts the affairs of a facility," *id.* at 1887. Because of CERCLA's concern with environmental contamination, this authority must relate to "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* However, a party need not exercise complete control over all decisions in the chain of events which results in a release to incur operator liability. Rather, where the party's operational decisions, in conjunction with surrounding circumstances, contribute to a release, operator liability may attach. *See Westfarm Associates v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 680–81 (4th Cir.1995).

Applying that principal, courts have found that the operation and management of municipal sewer lines may create owner/operator liability under CERCLA. *See id.; Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528, 1535–36 (E.D.Cal.1992). In *Westfarm*, the Fourth Circuit found that the Washington Suburban Sanitary Sewer Commission ("WSSC") was liable under CERCLA for the release of toxic substances deposited in the municipal sewer system and released through leaky joints and cracks in the sewer pipes. *Westfarm*, 66 F.3d at 680–81. The Court noted that CERCLA does not take a simplistic view of who is and is not a 'polluter,'

*id.* at 681, and found that, although the WSSC did not make the decision to release toxic substances to the sewer, its control over and failure to adequately maintain the municipal sewer line "earned it some responsibility for the contamination," *id.* This reasoning is also applicable to the owner/operator of a private sewer system, such as the sewer system constructed by Meyer.

■ Because the United States seeks to establish Meyer's personal liability, it must also show either that the corporate veil should be pierced or that Meyer was personally involved or "intimate[ly] particip[ated]" in the operation of the sewer system. *Carter–Jones Lumber Co. v. Dixie Distributing Co.*, 166 F.3d 840, 846 (6th Cir.1999). The latter inquiry must focus on Meyer's actual exercise of control over the operation of the sewer system, rather than his capacity to do so. *Bestfoods*, 118 S.Ct. at 1889. The United States invokes the second prong of this test, providing undisputed evidence that Meyer was heavily and personally involved in the construction and maintenance of the eastern and perimeter sewer lines. Based on Meyer's role as the party directing the construction, alteration and repair of these lines, the Court finds that Meyer operated the eastern and perimeter sewer lines. Hazardous wastes were deposited in [both the eastern and perimeter sewer lines] and were released from these lines. Accordingly, the Court finds that Meyer qualifies as an operator of the eastern and perimeter sewer lines for CERCLA purposes.[2] *See Bestfoods*, 118 S.Ct. at 1887; *Lincoln Properties v. Higgins*, 823 F.Supp. 1528, 1534–35 (E.D.Cal.1992); *K.C.1986 Limited Partnership v. Reade Manufacturing*, 33 F.Supp.2d 1143, 1153 (W.D.Mo.1998).

In his opposition, Meyer argues that he should not be held liable for the toxic substances generated by Northernaire, because he was unaware of their generation or disposal. In essence, Meyer is arguing for the "innocent landowner" or "third party" defense. CERCLA provides a limited defense where the defendant can prove:

(1) that another party was the 'sole cause' of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment or agency relationship with the defendant; and (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party.

*Westfarm*, 66 F.3d at 682. In prior litigation related to this site, this defense was held to be inapplicable to R.W. Meyer, Inc., because it had entered into a lease with Northernaire. *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 748 (W.D.Mich.1987). Even assuming that this contractual relationship cannot be attributed to Meyer himself, the defense is unavailable.

■ A party may meet the first element of the defense by demonstrating that he or she was not the "proximate cause" of the release. *Lincoln Properties*, 823 F.Supp. at 1540–42. A party was not a proximate cause of a release, if the release was unforeseeable and its own conduct was an "indirect and insubstantial" link in the chain of events leading to the release. *Lincoln Properties*, 823 F.Supp. at 1543. To meet the third element, a party must demonstrate that he or she "exercised due care with respect to the hazardous substances concerned and ... took precautions against foreseeable acts or omissions of any ... third party." *Westfarm*, 66 F.3d at 682 (internal citations omitted).

**2.** Meyer repeatedly asserts that he cannot be liable, because he did not construct the northern sewer line or the floor drains. However, because the eastern and perimeter sewer lines also qualify as CERCLA facilities from which releases were made, Meyer cannot defeat liability simply by showing that he was not involved with or aware of the northern sewer line.

The undisputed facts in this case show that Northernaire's releases were foreseeable and that Meyer did not exercise due care to prevent these releases. When first building the perimeter sewer line, Meyer knew that the Property would be used as an industrial park whose residents would probably generate industrial waste water, but he did not build the perimeter sewer line to accommodate such wastes. Meyer also knew that Northernaire would generate hazardous wastes and that the City of Cadillac intended to sample sewer effluent from the Northernaire plant to monitor for hazardous wastes, but took no action to prevent the release of such wastes. Although Meyer asserts that Northernaire promised to dispose of all hazardous wastes off-site, he did not incorporate this understanding into the lease agreement negotiated with Northernaire or otherwise limit the wastes Northernaire could release to the eastern or perimeter sewer lines. Meyer made no effort to monitor Northernaire's releases himself or to review the sampling conducted by the City of Cadillac. Meyer took no action when Rennie informed him that Northernaire's sewer effluents included hazardous substances, either to prevent Northernaire from releasing these substances to the eastern and perimeter sewer lines, remove Northernaire from the Property or prevent leaking or leaching from the sewer lines. Accordingly, Meyer is not protected from liability by the "innocent landowner" or "third party" defense.

## CONCLUSION

For the reasons given above, this Court finds that Meyer is personally liable under CERCLA as the operator of the eastern and perimeter sewer lines. Accordingly, the United States' Motion for Partial Summary Judgment is granted. In light of this decision, Meyer's Motion for Summary Judgment is denied.